# VIRGINIA *v.* MARYLAND

No. 129, Orig.   Argued October 7, 2003—Decided December 9, 2003

58

REHNQUIST, C. J., delivered the opinion of the Court, in which O'CONNOR, SCALIA, SOUTER, THOMAS, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which KENNEDY, J., joined, *post*, p. 80. KENNEDY, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 82.

*Stuart A. Raphael* argued the cause for plaintiff. With him on the brief were *Jerry W. Kilgore,* Attorney General of Virginia, *William H. Hurd,* Solicitor General, *Roger L. Chaffe* and *Frederick S. Fisher,* Senior Assistant Attorneys General, and *Jill M. Dennis.*

*Andrew H. Baida,* former Solicitor General of Maryland, argued the cause for defendant. With him on the briefs were *J. Joseph Curran, Jr.,* Attorney General, and *Maureen Mullen Dove, M. Rosewin Sweeney, Adam D. Snyder,* and *Randolph S. Sergent,* Assistant Attorneys General.*

---

*Briefs of *amici curiae* were filed for the Audubon Naturalist Society by *Kathleen A. Behan* and *Christopher D. Man;* and for the Loudoun County Sanitation Authority of Virginia by *Stanley M. Franklin, E. Duncan Getchell, Jr., Robert L. Hodges,* and *James E. Brown.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Invoking this Court's original jurisdiction, the Commonwealth of Virginia seeks a declaration that it has a right to withdraw water from the Potomac River and to construct improvements appurtenant to the Virginia shore free from regulation by the State of Maryland. We granted Virginia leave to file a complaint, 530 U. S. 1201 (2000), and referred the action to a Special Master, 531 U. S. 922 (2001). The Special Master filed a Report recommending that we grant the relief sought by Virginia. Maryland has filed exceptions to that Report.

Rising in the Appalachian Highlands of Maryland and West Virginia, the Potomac River (River) flows nearly 400 miles before emptying into Chesapeake Bay. For the lower part of its course, it forms the boundary between Maryland and the District of Columbia on the north, and West Virginia and Virginia on the south.

Control of the River has been disputed for nearly 400 years.. In the 17th century, both Maryland and Virginia laid claim to the River pursuant to conflicting royal charters issued by different British monarchs. See. *Maryland* v. *West Virginia,* 217 U. S. 1, 24–29 (1910); *Morris* v. *United States,* 174 U. S. 196, 223–225 (1899).

Virginia traced her claim primarily to the 1609 charter issued by King James I to the London Company, and to a 1688 patent for Virginia's Northern Neck, issued by King James II to Lord Thomas Culpeper. *West Virginia, supra,* at 28–29; *Morris,* 174 U. S., at 223–224. Both the 1609 charter and the 1688 patent included the entire Potomac River. *Id.,* at 223. Maryland relied on the charter of 1632 from King Charles I to Lord Baltimore, which also included the Potomac River, although the precise scope of the grant remained in dispute. *West Virginia, supra,* at 20, 24–25; *Morris, supra,* at 223–225. In her Constitution of 1776, Virginia ceded ownership of the River to Maryland to the extent the

River was included in Maryland's 1632 charter. Va. Const., Art. XXI, reprinted in 9 W. Hening's Statutes at Large 118 (1821). Importantly for our purposes, Virginia specifically excepted from her cession "the free navigation and use of the rivers *Potowmack* and *Pocomoke*, with the property of the *Virginia* shores or strands bordering on either of the said rivers, and all improvements which have been or shall be made thereon." *Ibid.* In October of that same year, Maryland passed a resolution at a convention of her constitutional delegates that rejected the reservation in Virginia's Constitution. Proceedings of the Conventions of the Province of Maryland, held at the City of Annapolis, in 1774, 1775, 1776, pp. 292–293 (J. Lucas & E. Deaver eds. 1836). The unanimous convention asserted Maryland's "sole and exclusive jurisdiction" over the River. *Ibid.*

In the early years of the Republic, "great inconveniences were experienced by citizens of both Maryland and Virginia from the want of established and recognized regulations between those States respecting the jurisdiction and navigation of the river Potomac." *Wharton* v. *Wise*, 153 U. S. 155, 162 (1894). To address these problems, Maryland and Virginia appointed commissioners, who, at the invitation of George Washington, met at Mount Vernon in March 1785.[1] *Id.*, at 163; 2 The Diaries of George Washington 1748–1799, p. 354 (J. Fitzpatrick ed. 1925). The Mount Vernon conference produced a binding compact (*1785 Compact*) between the States, which was subsequently ratified by the Maryland and Virginia Legislatures. *Wharton, supra,* at 165–166; 1785–1786 Md. Laws ch. 1; 1785 Va. Acts ch. 17. The 1785 Compact's 13 articles provided, *inter alia,* that the River "shall be considered as a common highway, for the purpose of navigation and commerce to the citizens of Virginia, and Maryland" (Article Sixth); that all laws regulating fishing

---

[1] Maryland's Commissioners were Daniel of St. Thomas Jenifer, Thomas Stone, and Samuel Chase; Virginia was represented by George Mason and Alexander Henderson. 1785–1786 Md. Laws ch. 1 (preamble).

and navigation "shall be made with the mutual consent and approbation of both states" (Article Eighth); and that jurisdiction over criminal offenses shall be determined based on the citizenship of the offender and the victim (Article Tenth). Va. Code Ann. Compacts App., pp. 342–343 (Lexis 2001). Of particular relevance to this case, Article Seventh provided:

> "The citizens of each state respectively shall have full property in the shores of Potowmack river adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river." *Ibid.*

Although the 1785 Compact resolved many important navigational and jurisdictional issues, it did not determine the boundary line between the States, an issue that was "left . . . open to long continued disputes." *Marine Railway & Coal Co.* v. *United States,* 257 U. S. 47, 64 (1921); *Morris, supra,* at 224; *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 724 (1838). In 1874, Virginia and Maryland submitted the boundary dispute to binding arbitration before a panel of "eminent lawyers" composed of Jeremiah S. Black, James B. Beck, and Charles J. Jenkins. *Maryland* v. *West Virginia,* 217 U. S. 577, 579 (1910). On January 16, 1877, the arbitrators issued their award (hereinafter Black-Jenkins Award or Award), placing the boundary at the low-water mark on the Virginia shore of the Potomac.[2] Although Maryland was thus granted ownership of the entire bed of the River, Article Fourth of the Award further provided:

> "Virginia is entitled not only to full dominion over the soil to low-water mark on the south shore of the Potomac, but has a right to such use of the river beyond the line of low-water mark as may be necessary to the full

---

[2] The "low-water mark" of a river is defined as "the point to which the water recedes at its lowest stage." Black's Law Dictionary 1586 (7th ed. 1999).

enjoyment of her riparian ownership, without impeding the navigation or otherwise interfering with the proper use of it by Maryland, agreeably to the compact of seventeen hundred and eighty-five." Act of Mar. 3, 1879, ch. 196, 20 Stat. 482 (internal quotation marks omitted).

The Black-Jenkins Award was ratified by the Legislatures of Maryland and Virginia, 1878 Md. Laws ch. 274; 1878 Va. Acts ch. 246, and approved by the United States Congress, pursuant to the Compact Clause of the Constitution, Art. I, § 10, cl. 3; Act of Mar. 3, 1879, ch. 196, 20 Stat. 481. See also *Wharton,* 153 U. S., at 172–173. We held that when Congress approved the Black-Jenkins Award it implicitly consented to the 1785 Compact as well. *Id.,* at 173.[3]

In 1933, Maryland established a permitting system for water withdrawal and waterway construction taking place within Maryland territory. 1933 Md. Laws ch. 526, §§ 4, 5 (current version codified at Md. Envir. Code Ann. § 5–501 *et seq.* (1996)). In 1956, Fairfax County became the first Virginia municipal corporation to apply for a water withdrawal permit, seeking leave to withdraw up to 15 million gallons of water per day. App. to Exceptions of Maryland to Report of Special Master 196. Maryland granted that permit in 1957. Between 1957 and 1996, Maryland issued, without objection, at least 29 water withdrawal permits to Virginia entities. *Id.,* at 57, 197–205. Since 1968, it has likewise issued numerous waterway construction permits to Virginia entities. *Id.,* at 276–280.

In 1996, the Fairfax County Water Authority (FCWA) sought permits from Maryland for construction of a water intake structure extending 725 feet from the Virginia shore above the tidal reach of the Potomac River. The structure

---

[3] Because Maryland and Virginia entered into the 1785 Compact prior to the adoption of the United States Constitution, Congress had not previously approved it pursuant to the Constitution's Compact Clause. See generally *Wharton,* 153 U. S., at 165–173.

was designed to improve water quality for Fairfax County residents. Several Maryland officials opposed Virginia's construction proposal, arguing that it would harm Maryland's interests by facilitating urban sprawl in Virginia. In late 1997, the Maryland Department of the Environment (MDE) refused to issue the permit, holding that Virginia had not demonstrated a sufficient need for the offshore intake. This marked the first time Maryland had denied such a permit to a Virginia entity. Virginia pursued MDE administrative appeals for more than two years, arguing at each stage that it was entitled to build the water intake structure under the 1785 Compact and the Black-Jenkins Award. In February 2000, Virginia, still lacking a permit, sought leave to file a bill of complaint in this Court, which we granted on March 30, 2000.[4] Ultimately, the MDE's "Final Decision Maker" determined that Virginia had demonstrated a sufficient need for the project. In 2001, Maryland finally issued the permit to FCWA, but only after the Maryland Legislature attached a condition to the permit requiring FCWA to place a permanent flow restrictor on the intake pipe to limit the amount of water that could be withdrawn from the River, 2000 Md. Laws ch. 557, § 1(b)(2)(ii). See Lodging Accompanying Reply by Virginia to Maryland's Exceptions to Report of Special Master L–336 to L–339 (hereinafter Va. Lodging) (permit issued to FCWA).

In October 2000, while Virginia's permit request was pending, we referred Virginia's bill of complaint to Special Master Ralph I. Lancaster, Jr. Virginia sought a declaratory judg-

---

[4] This case marks the second time Virginia sought leave to file an original action against Maryland concerning Potomac River rights. See *Virginia* v. *Maryland*, 355 U. S. 269 (1957) *(per curiam)*. In the earlier fray, the Special Master persuaded the States to settle their dispute. They entered into a new compact, which superseded the 1785 Compact but specifically preserved the rights delineated in Article Seventh. See Potomac River Compact of 1958, 1959 Md. Laws ch. 269; 1959 Va. Acts ch. 28; Pub. L. 87–783, 76 Stat. 797.

ment that Maryland may not require Virginia, her governmental subdivisions, or her citizens to obtain a permit in order to construct improvements appurtenant to her shore or to withdraw water from the River. Maryland did not dispute that Virginia had rights to withdraw water and construct improvements under the 1785 Compact and the Black-Jenkins Award. Report of the Special Master 12 (hereinafter Report). Rather, Maryland asserted that, as sovereign over the River to the low-water mark, it was entitled to regulate Virginia's exercise of these rights.[5] *Ibid.* Maryland further argued that even if the 1785 Compact and the Award granted Virginia unrestricted rights of waterway construction and water withdrawal, Virginia lost those rights by acquiescing in Maryland's regulation of activities on the Potomac.

The Special Master recommended that we grant the relief sought by Virginia. Interpreting the 1785 Compact and the Black-Jenkins Award, he concluded that these two documents not only gave citizens of Virginia the right to construct improvements from their riparian property into the River, but gave the Commonwealth of Virginia the right to use the River beyond the low-water mark as necessary to the full enjoyment of her riparian rights. The Special Master rejected Maryland's claimed authority to regulate Virginia's exercise of her rights, finding no support for that proposition in either the 1785 Compact or the Award. Finally, the Special Master rejected Maryland's defense of acquiescence by Virginia.

Maryland filed exceptions to the Report of the Special Master. We now overrule those exceptions.

Virginia and Maryland agree that Article Seventh of the 1785 Compact and Article Fourth of the Black-Jenkins

---

[5] Maryland also contended that the 1785 Compact and the Black-Jenkins Award did not apply to the nontidal portions of the River. The Special Master rejected that argument, Report 96, and Maryland does not pursue it before this Court.

Award govern the instant controversy. Determining whether Virginia's rights are subject to Maryland's regulatory authority obviously requires resort to those documents. We interpret a congressionally approved interstate compact "[j]ust as if [we] were addressing a federal statute." *New Jersey* v. *New York*, 523 U. S. 767, 811 (1998); see also *ibid.* ("'[C]ongressional consent 'transforms an interstate compact . . . into a law of the United States'" (quoting *Cuyler* v. *Adams*, 449 U. S. 433, 438 (1981))). Article Seventh of the 1785 Compact provides:

> "The citizens of each state respectively shall have full property in the shores of Potowmack river adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river." Va. Code Ann. Compacts App., pp. 342–343.

The plain language of Article Seventh thus grants to the "citizens of each state" "full property" rights in the "shores of Potowmack river" and the "privilege" of building "improvements" from the shore. Notably absent is any grant or recognition of sovereign authority to regulate the exercise of this "privilege" of the "citizens of each state." The lack of such a grant of regulatory authority in the first clause of Article Seventh contrasts with the second clause of Article Seventh and Article Eighth, which also recognized a right held by the "citizens" of each State:

> "[T]he right of fishing in the river shall be common to, and equally enjoyed by, the citizens of both states . . . . *Eighth.* All laws and regulations which may be necessary for the preservation of fish . . . shall be made with the mutual consent and approbation of both states." *Id.*, at 343.

Thus, while the Article Seventh right to build improvements was not explicitly subjected to any sovereign regulatory au-

thority, the fishing right in the same article was subjected to mutually agreed-upon regulation. We agree with Virginia that these differing approaches to rights contained in the same article of the 1785 Compact indicate that the drafters carefully delineated the instances in which the citizens of one State would be subject to the regulatory authority of the other. Other portions of the 1785 Compact reflect this design. See Article Fourth (providing that certain vessels "may enter and trade in any part of either state, with a permit from the naval-officer of the district from which such vessel departs with her cargo . . ."); Article Eighth (providing for joint regulation of navigation on the River); Article Ninth (providing for a bistate commission to govern the erection of "light houses, beacons, buoys, or other signals"). *Id.,* at 342–343. If any inference at all is to be drawn from Article Seventh's silence on the subject of regulatory authority, we think it is that each State was left to regulate the activities of her own citizens.

Maryland, however, argues that we must read Article Seventh's regulatory silence in her favor because her sovereignty over the River was "well-settled" by the time the 1785 Compact was drafted. Exceptions of Maryland to Report of Special Master 19 (hereinafter Md. Brief). Maryland is doubtless correct that if her sovereignty over the River was well settled as of 1785, we would apply a strong presumption against reading the Compact as stripping her authority to regulate activities on the River. See, *e. g., Massachusetts* v. *New York,* 271 U. S. 65, 89 (1926) ("[D]ominion over navigable waters, and property in the soil under them, are so identified with the exercise of the sovereign powers of government that a presumption against their separation from sovereignty must be indulged"). But we reject Maryland's historical premise.

Each State has produced reams of historical evidence to support its respective view about the status of sovereignty over the River as of 1785. We need not delve deeply into

this historical record to decide this issue. Our own cases recognize that the scope of Maryland's sovereignty over the River was in dispute both before and after the 1785 Compact. *Morris,* upon which Maryland relies, does not support her argument. Therein, we observed that "[o]wing to the conflicting descriptions, as respected the Potomac River, contained in [the] royal grants, a controversy early arose between Virginia and Maryland." 174 U. S., at 224. While the 1785 Compact resolved certain jurisdictional issues, it did not determine the boundary between the States. *Ibid.* Accordingly, the controversy over sovereignty was "still continuing . . . in 1874." *Ibid.* In *Marine Railway,* we likewise acknowledged that even *after* the 1785 Compact, "the question of boundary" was left "open to long continued disputes." 257 U. S., at 64. See also *Rhode Island,* 12 Pet., at 723 ("Maryland and Virginia were contending about boundaries in 1835 . . . and the dispute is yet an open one [in 1838]"). *Morris* did ultimately decide that Maryland's 1632 charter included the Potomac River from shore to shore, 174 U. S., at 225, but this conclusion, reached in 1899, hardly negates our statements in that and other cases recognizing that the dispute over the interstate boundary continued well into the 19th century.

The mere existence of the 1785 Compact further belies Maryland's argument. After all, the 1785 Compact sought "to regulate and settle the jurisdiction and navigation" of the River. 1785–1786 Md. Laws ch. 1 (preamble). This endeavor would hardly have been required if, as Maryland claims, her well-settled sovereignty gave her exclusive authority to regulate all activity on the River.[6] Nowhere is this more clear than with respect to the Article Seventh right of Virginia citizens to build improvements from the Virginia shore. In 1776, Virginia had purported to reserve

---

[6] For example, if Maryland had well-settled exclusive jurisdiction over the River, it certainly would not have agreed to *joint* regulation of fishing as it did in Article Eighth of the 1785 Compact.

sovereignty over "the property of the *Virginia* shores or strands bordering on either of the said rivers, and all improvements which have been or shall be made thereon." Va. Const., Art. XXI, reprinted in 9 W. Hening's Statutes at Large 118. It would be anomalous to conclude that *Maryland's* sovereign authority to regulate the construction of such improvements was so well established a mere nine years later that the 1785 Compact's drafters did not even need to mention it.

Accordingly, we read the 1785 Compact in light of the ongoing dispute over sovereignty. Article Seventh simply guaranteed that the citizens of each State would retain the right to build wharves and improvements regardless of which State ultimately was determined to be sovereign over the River. That would not be decided until the Black-Jenkins Award of 1877.

The Black-Jenkins arbitrators held that Maryland was sovereign over the River to the low-water mark on the Virginia shore. See Act of Mar. 3, 1879, ch. 196, 20 Stat. 481–482. "[I]n further explanation of this award, the arbitrators deem[ed] it proper to add" four articles, *id.*, at 482, the last of which provides:

> " 'Virginia is entitled not only to full dominion over the soil to low-water mark on the south shore of the Potomac, but has a right to such use of the river beyond the line of low-water mark as may be necessary to the full enjoyment of her riparian ownership, without impeding the navigation or otherwise interfering with the proper use of it by Maryland, agreeably to the compact of seventeen hundred and eighty-five.' " *Ibid.*

Unlike the 1785 Compact's Article Seventh, which concerned the rights of citizens, the plain language of Article Fourth of the Award gives Virginia, as a sovereign State, the right to use the River beyond the low-water mark. Nothing in Article Fourth suggests that Virginia's rights are subject to

Maryland's regulation. Indeed, Virginia's riparian rights are limited only by Maryland's right of "proper use" and the proviso that Virginia not "imped[e] . . . navigation," limitations that hardly would have been necessary if Maryland retained the authority to regulate Virginia's actions. Maryland argues, however, that the Black-Jenkins Award simply confirmed her well-settled ownership of the Potomac, and thus the rights granted to Virginia in Article Fourth are subject to Maryland's regulatory authority.

We have already rejected Maryland's contention that the extent of her sovereignty over the Potomac was well settled before the 1785 Compact. Similarly, we fail to see why Maryland and Virginia would have submitted to binding arbitration "for the purpose of ascertaining and fixing the boundary" between them if that boundary was already well settled. *Id.*, at 481 (preamble). Indeed, the opinion issued by the arbitrators dispels any doubt that sovereignty was in dispute, and confirms that Virginia's Article Fourth rights are sovereign rights not subject to Maryland's regulation.

At the beginning of their opinion, the arbitrators explained that their task was to "ascertain what boundaries were assigned to Maryland" by her 1632 charter. Black-Jenkins Opinion (1877), App. to Report, p. D–2. The arbitrators then outlined the extent of the existing dispute over the boundary:

> "The State of Virginia, through her Commissioners and other public authorities, adhered for many years to her claim for a boundary on the left bank of the Potomac. But the gentlemen who represent her before us expressed with great candor their own opinion that a true interpretation of the King's concession would divide the river between the States by a line running in the middle of it. This latter view they urged upon us with all proper earnestness, and it was opposed with equal zeal by the counsel for Maryland, who contended that the

whole river was within the limits of the grant to Lord Baltimore." *Id.*, at D–7.

Thus, contrary to Maryland's assertion, sovereignty over the River was hotly contested at the time of the arbitration. We see no reason, therefore, to depart from Article Fourth's plain language, which grants to Virginia the sovereign right to use the River beyond the low-water mark.

The reasoning contained in the Black-Jenkins Opinion confirms the plain language of Article Fourth of the Award. Although the arbitrators initially determined that the boundary contained in the 1632 charter was the high-water mark on the Virginia shore, *id.*, at D–9, they ultimately held that Virginia had gained ownership by prescription of the soil up to the low-water mark, *id.*, at D–18. In the same paragraph, the arbitrators explained that Virginia had a sovereign right to build improvements appurtenant to her shore:

> "The evidence is sufficient to show that Virginia, from the earliest period of her history, used the South bank of the Potomac as if the soil to low water-mark had been her own. She did not give this up by her Constitution of 1776, when she surrendered other claims within the charter limits of Maryland; but on the contrary, she expressly reserved 'the property of the Virginia shores or strands bordering on either of said rivers, (Potomac and Pocomoke,) and all improvements which have or will be made thereon.' By the compact of 1785, Maryland assented to this, and declared that 'the citizens of each State respectively shall have full property on the shores of Potomac and adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements.' . . . Taking all together, we consider it established that Virginia has a proprietory right on the south shore to low water-mark, and, appurtenant thereto, has a privilege to erect any structures con-

nected with the shore which may be necessary to the full enjoyment of her riparian ownership, and which shall not impede the free navigation or other common use of the river as a public highway.

"To that extent Virginia has shown her rights on the river so clearly as to make them indisputable." *Id.,* at D–18 to D–19.

The arbitrators did not differentiate between Virginia's dominion over the soil and her right to construct improvements beyond low-water mark. Indeed, Virginia's right "to erect . . . structures connected with the shore" is inseparable from, and "necessary to," the "full enjoyment of her riparian ownership" of the soil to low-water mark. *Ibid.* Like her ownership of the soil, Virginia gained the waterway construction right by a long period of prescription. That right was "reserved" in her 1776 Constitution, "assented to" by Maryland in the 1785 Compact, and "indisputabl[y]" shown by Virginia. *Ibid.* Thus, the right to use the River beyond low-water mark is a right of Virginia *qua* sovereign, and was nowhere made subject to Maryland's regulatory authority. Maryland's necessary concession that Virginia owns the soil to low-water mark must also doom her claim that Virginia does not possess riparian rights appurtenant to those lands to construct improvements beyond the low-water mark and otherwise make use of the water in the River.[7]

---

[7] The sovereign character of Virginia's Article Fourth riparian rights is further confirmed by the proposal of Maryland's representatives before the arbitrators. Maryland contended that the "true" boundary line should be drawn around "all wharves and other improvements now extending or which may hereafter be extended, by authority of Virginia from the Virginia shore into the [Potomac] beyond low water mark." Va. Lodging L–130 (W. Whyte and I. Jones, Boundary Line Between the States of Maryland and Virginia, Before the Hons. Jeremiah S. Black, William A. Graham, and Charles J. Jenkins, Arbitrators upon the Boundary Line between the States of Virginia and Maryland (June 26, 1874)). In proceedings from 1870–1874, in which the States unsuccessfully attempted

We reject Maryland's remaining arguments. Maryland, as well as JUSTICE STEVENS, *post*, at 81 (dissenting opinion), contends that the Award merely confirmed the private property rights enjoyed by Virginia citizens under Article Seventh of the 1785 Compact and the common law, which rights are in turn subject to Maryland's regulation as sovereign over the River. The arbitration proceedings, however, were convened to "ascertai[n] and fi[x] the boundary" between co-equal sovereigns, 20 Stat. 481 (preamble), not to adjudicate the property rights of private citizens. Neither Maryland nor JUSTICE STEVENS provides any reason to believe the arbitrators were addressing private property rights when they awarded "Virginia" a right to use the River beyond the low-water mark. Their interpretation, moreover, renders Article Fourth duplicative of the 1785 Compact and the common law (which secured riparian owners' property rights) and the rest of the Black-Jenkins Award (which granted Maryland sovereignty to low-water mark).[8] Only by read-

---

to fix the boundary without the necessity of arbitration, Maryland's commissioners took the same position, which they described as follows:

"The line along the Potomac River is described in our first proposition according to our construction of the compact of 1785, and as we are informed, is according to the general understanding of the citizens of both States residing upon or owning lands bordering on the shores of that river, and also in accordance with the actual claim and exercise of jurisdiction by the authorities of the two States hitherto." *Id.*, at L–14 (Report and Journal of Proceedings of the Joint Commissioners to Adjust the Boundary Line of the States of Maryland and Virginia 27 (1874)).

Although the arbitrators did not accept Maryland's proposal to preserve Virginia's sovereign right to build improvements by including them within Virginia's territory, they accomplished the same result in Article Fourth of the Award.

[8] Similarly, JUSTICE KENNEDY does not adequately explain why Article Fourth—part of a document that grants unrestricted sovereign rights—would merely "affir[m]" that Virginia, as much as its citizens, has riparian rights under the 1785 Compact," *post*, at 87 (dissenting opinion), when Virginia, as owner of the soil to low-water mark, already possessed such rights under the common law.

ing Article Fourth in accord with its plain lánguage can this Court give effect to each portion of the Award. See, *e. g.*, *TRW Inc.* v. *Andrews*, 534 U. S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant'") (quoting *Duncan* v. *Walker*, 533 U. S. 167, 174 (2001) (some internal quotation marks omitted)).

Relatedly, Maryland argues that the Award could not have "elevate[d]," Md. Brief 29, the private property rights of the 1785 Compact to sovereign rights because the arbitrators disclaimed "authority for the construction of this compact," Black-Jenkins Opinion (1877), App. to Report, at D–18. Again, Maryland mischaracterizes the arbitrators' decision. In granting Virginia sovereign riparian rights, the arbitrators did not construe or alter any private rights under the 1785 Compact; rather, they held that Virginia had gained sovereign rights by prescription.

Finally, Maryland notes that under Article Fourth of the Award, Virginia must exercise her riparian rights on the River " 'without impeding the navigation *or otherwise interfering with the proper use of it by Maryland . . . .*'" 20 Stat. 482 (emphasis added). Maryland suggests that this language indicates her continuing regulatory authority over Virginia's exercise of her riparian rights. This seems to us a strained reading. The far more natural reading accords with the plain language of the Award and opinion: Maryland and Virginia each has a sovereign right to build improvements appurtenant to her own shore and to withdraw water, without interfering with the "proper use of" the River by the other.[9]

---

[9] Federal common law governs interstate bodies of water, ensuring that the water is equitably apportioned between the States and that neither State harms the other's interest in the river. See, *e. g.*, *Colorado* v. *New Mexico*, 459 U. S. 176, 183 (1982) ("Equitable apportionment is the doctrine

JUSTICE KENNEDY, while acknowledging that Virginia has a right to use the River, argues that Maryland may regulate Virginia's riparian usage so long as she does not exclude Virginia from the River altogether. *Post,* p. 82 (dissenting opinion). To reach this conclusion, he reasons that the Black-Jenkins Opinion rested Virginia's prescriptive riparian rights solely on Maryland's assent to the riparian rights granted to private citizens in the 1785 Compact. *Post,* at 87–89. According to JUSTICE KENNEDY, therefore, "Virginia's claims under Black-Jenkins rise as high as the Compact but no higher." *Post,* at 89.

We have already held that the Award's plain language permits no inference of Maryland's regulatory authority, *supra,* at 69–70; we also disagree that the arbitrators relied solely on the 1785 Compact as support for Virginia's prescriptive rights. To the contrary, the arbitrators' opinion also relied upon Virginia's riparian usage "from the earliest period of her history" and her express reservation in her 1776 Constitution of the unrestricted right to build improvements from the Virginia shore. Black-Jenkins Opinion (1877), App. to Report, at D–18. Indeed, since the arbitrators disclaimed "authority for the construction of [the 1785] compact . . . because nothing which concern[ed] it" was before them, *ibid.,* it would be anomalous to conclude that Virginia's "sole right" under the Award "stem[s] from," and is "delimited" by, Article Seventh of the Compact. *Post,* at 90 (KENNEDY, J., dissenting).

Accordingly, we conclude that the Black-Jenkins Award gives Virginia sovereign authority, free from regulation by Maryland, to build improvements appurtenant to her shore and to withdraw water from the River, subject to the constraints of federal common law and the Award.

---

of federal common law that governs the disputes between States concerning their rights to use the water of an interstate stream").

We next consider whether Virginia has lost her sovereign riparian rights by acquiescing in Maryland's regulation of her water withdrawal and waterway construction activities. We recently considered in depth the "affirmative defense of prescription and acquiescence" in *New Jersey*, 523 U. S., at 807. To succeed in her defense, Maryland must "'show by a preponderance of the evidence . . . a long and continuous . . . assertion of sovereignty over'" Virginia's riparian activities, as well as Virginia's acquiescence in her prescriptive acts. *Id.*, at 787 (quoting *Illinois* v. *Kentucky*, 500 U. S. 380, 384 (1991)). Maryland has not carried her burden.

Although "we have never established a minimum period of prescription" necessary for one State to prevail over a co-equal sovereign on a claim of prescription and acquiescence, *New Jersey*, 523 U. S., at 789, we have noted that the period must be "substantial," *id.*, at 786. Maryland asserts that in the 125 years since the Black-Jenkins Award, Virginia has acquiesced in her pervasive exercise of police power over activities occurring on piers and wharves beyond the low-water mark. Among other things, Maryland claims, and Virginia does not dispute, that it has taxed structures erected on such improvements (*i. e.*, restaurants, etc.); issued licenses for activities occurring thereon (*i. e.*, liquor, gambling, etc.); and exercised exclusive criminal jurisdiction over crimes occurring on such improvements beyond the low-water mark. We agree with the Special Master that this evidence has little or no bearing on the narrower question whether Virginia acquiesced in Maryland's efforts to regulate her right to construct the improvements in the first instance and to withdraw water from the River. See Report 79–82. With respect to Maryland's regulation of these particular rights, the claimed prescriptive period is much shorter.

It is undisputed that Maryland issued her first water withdrawal permit to a Virginia entity in March 1957 and her first waterway construction permit in April 1968. The pre-

scriptive period ended, at the latest, in February 2000, when Virginia sought leave to file a bill of complaint in this Court. Accordingly, Maryland has asserted a right to regulate Virginia's water withdrawal for, at most, 43 years, and a right to regulate waterway construction for, at most, 32 years. Only once before have we deemed such a short period of time sufficient to prove prescription in a case involving our original jurisdiction. See *Nebraska* v. *Wyoming*, 507 U. S. 584, 594–595 (1993) (41 years). In that case, we held that Nebraska's sovereign right to water stored in certain inland lakes was established by a decree issued in 1945. *Id.*, at 595. We held, in the alternative, that "Wyoming's arguments are foreclosed by its postdecree acquiescence" for 41 years. *Ibid.* Here, it is Virginia's sovereign right that was clearly established by a prior agreement, and Maryland that seeks to defeat those rights by showing Virginia's acquiescence. Under these circumstances, it is far from clear that such a short prescriptive period is sufficient as a matter of law. Cf. *New Jersey*, 523 U. S., at 789 (noting that a prescriptive period of 64 years is "not insufficient as a matter of general law"). But even assuming such a short prescriptive period would be adequate to overcome a sovereign right granted in a federally approved interstate compact, Maryland's claim fails because it has not proved Virginia's acquiescence.

To succeed on the acquiescence prong of her defense, Maryland must show that Virginia "failed to protest" her assertion of sovereign authority over waterway construction and water withdrawal. *Id.*, at 807.[10] As the Special Master found, however, Virginia vigorously protested Maryland's asserted authority during the negotiations that led to the passage of § 181 of the Water Resources Development Act of 1976 (WRDA), 90 Stat. 2939–2940, codified at 42 U. S. C. § 1962d–11a.

---

[10] Maryland's evidence that Virginia has never operated a permitting system for water withdrawal or waterway construction is insufficient to satisfy Maryland's burden. See *New Jersey*, 523 U. S., at 788, n. 9.

Section 181 ultimately required Maryland and Virginia to enter into an agreement with the Secretary of the Army apportioning the waters of the Potomac River during times of low flow. 90 Stat. 2939–2940. At the outset of negotiations over § 181, Maryland proposed a draft bill that asserted her exclusive authority to allocate water from the Potomac. Virginia officials protested Maryland's proposal in three congressional hearings during the summer of 1976, asserting Virginia's unqualified right to withdraw water from the River, and objecting that Maryland's bill "'might deprive Virginia of its riparian rights to the waters of the Potomac River as guaranteed by the 1785 compact . . . and the arbitration award of 1877 . . . .'" Omnibus Water Resources Development Act of 1976: Hearings before the Subcommittee on Water Resources of the Senate Committee on Public Works, 94th Cong., 2d Sess., 2068 (statement of J. Leo Bourassa) (Aug. 5, 1976); see also Potomac River: Hearings and Markup before the Subcommittee on Bicentennial Affairs, the Environment, and the International Community, and the House Committee on the District of Columbia, 94th Cong., 2d Sess., 680, 693–694, 703 (statement of Earl Shiflet) (June 25, 1976); Water Resources Development—1976: Hearings before the Subcommittee on Water Resources of the House Committee on Public Works and Transportation, 94th Cong., 2d Sess., 442–446 (statement of Eugene Jensen) (Aug. 31, 1976). As a result of Virginia's protest, the final legislation provided that "nothing in this section shall alter any riparian rights or other authority of . . . the Commonwealth of Virginia, or any political subdivision thereof . . . relative to the appropriation of water from, or the use of, the Potomac River." 42 U. S. C. § 1962d–11a(c). Similarly, nothing in the Low Flow Allocation Agreement reached by Maryland and Virginia pursuant to the WRDA suggested that Maryland had authority to regulate Virginia's riparian rights in the River. Va. Lodging L–285 to L–309. We hold that § 181 of the WRDA and the Low Flow Allocation Agreement are conclusive evi-

dence that, far from acquiescing in Maryland's regulation, Virginia explicitly asserted her sovereign riparian rights.[11]

\*    \*    \*

Accordingly, we overrule Maryland's exceptions to the Report of the Special Master. We grant the relief sought by Virginia and enter the decree proposed by the Special Master.

*It is so ordered.*

## DECREE

The Court having exercised original jurisdiction over this controversy between two sovereign States; the issues raised having been tried before the Special Master appointed by the Court; the Court having received briefs and heard oral argument on the parties' exceptions to the Report of the Special Master; and the Court having issued its Opinion on all issues announced, *ante*, p. 56.

It is Hereby Ordered, Adjudged, Declared, and Decreed as follows:

1. Article Seventh of the Compact of 1785 between the Commonwealth of Virginia and the State of Maryland, which governs the rights of the Commonwealth of Virginia, its governmental subdivisions and its citizens to withdraw water from the Potomac River and to construct improvements appurtenant to the Virginia shore, applies to the entire length of the Potomac River, including its nontidal reach.

2. Virginia, its governmental subdivisions, and its citizens may withdraw water from the Potomac River and construct improvements appurtenant to the Virginia shore of the Potomac River free of regulation by Maryland.

3. Any conditions attached to the construction/water appropriation permit granted by Maryland to the Fairfax

---

[11] Consequently, we need not discuss other evidence of Virginia's protests, which has been ably chronicled by the Special Master. See Report 83–89.

County Water Authority on January 24, 2001, are null and void and the State of Maryland is enjoined from enforcing them.

4. The Court retains jurisdiction to entertain such further proceedings, enter such orders, and issue such writs as may from time to time be considered necessary or desirable to give proper force and effect to this Decree or to effectuate the rights of the parties.

5. The party States shall share equally in the compensation of the Special Master and his assistants, and in the expenses of this litigation incurred by the Special Master.

JUSTICE STEVENS, with whom JUSTICE KENNEDY joins, dissenting.

The basic facts that should control the disposition of this case are not in dispute. Maryland owns the water in the Potomac River to the low-water mark on the river's southern shore. Virtually the entire river is located within Maryland. Maryland is therefore the sovereign that exercises regulatory jurisdiction over the river, subject only to the provisions of the Maryland-Virginia Compact of 1785 (1785 Compact)[1] and the Virginia and Maryland Boundary Agreement of 1878 (Black-Jenkins Award),[2] and to the authority of the United States to preserve the river's navigability and protect its water quality.

Article Seventh of the 1785 Compact provides that the "citizens of each state respectively shall have full property in the shores of Potowmack river adjoining their lands, with all emoluments and advantages thereunto belonging," including the specific privilege of making wharves and other improvements, and a "right of fishing in the river [that] shall be common to, and equally enjoyed by, the citizens of both .

---

[1] 1785–1786 Md. Laws ch. 1; 1785 Va. Acts ch. 17.

[2] 1878 Md. Laws ch. 274; 1878 Va. Acts ch. 246; Act of Mar. 3, 1879, ch. 196, 20 Stat. 481.

states . . . ."[3]  The 1785 Compact is silent on the subject of water withdrawals.  Nevertheless, the owners of property abutting the river unquestionably enjoy full riparian rights as part of the "emoluments and advantages" appurtenant to their title.  Indeed, the Black-Jenkins Award confirms this understanding; under Article Fourth, Virginia "has a right to such use of the river beyond the line of low-water mark *as may be necessary to the full enjoyment of her riparian ownership* . . . ."[4]

The question for decision, therefore, is simple: Are riparian landowners' rights to withdraw water unlimited, or may they be restricted by the sovereign that owns and controls the adjacent water body (in this case, Maryland)?  In my opinion—an opinion apparently shared by the responsible Virginia and Maryland officials in the years between 1956 and 1996, see *ante,* at 63, 76–77—the common law provides a straightforward answer to that question.  Although riparian owners may withdraw water for domestic and agricultural purposes, the Federal Government and, "[i]n the absence of conflict with federal action or policy," the States "may exercise [their] police power[s] by controlling the initiation and conduct of riparian and nonriparian uses of water."  Restatement (Second) of Torts § 856, Comment *e* (1979).  Moreover, this case does not involve individual riparian landowners' withdrawals of water for their own domestic use, but the *Fairfax County Water Authority's withdrawals for the use of* county residents.  Under Virginia law, such "'use of the waters of a stream to supply the inhabitants of [an area] with water for domestic purposes is not a riparian right.'"  *Purcellville* v. *Potts,* 179 Va. 514, 521, 19 S. E. 2d 700, 703 (1942).  Clearly, then, the authority's proposed use of Potomac waters cannot be defended as an exercise of absolute and unregulable riparian rights.  It necessarily follows, I believe, that such a use may only be made with the consent of the sover-

---

[3] Va. Code Ann. Compacts App., pp. 342–343 (Lexis 2001).

[4] *Id.,* § 7.1–7, at 94 (emphasis added).

eign that owns the river. That sovereign is, indisputably, the State of Maryland.

We need go no further. This case does not require us to determine the precise extent or character of Maryland's regulatory jurisdiction. Rather, the narrow issue before us is whether Maryland may impose *any* limits on withdrawals by Virginia landowners whose property happens to abut the Potomac. Because those landowners' riparian rights are—like all riparian rights at common law—subject to the paramount regulatory authority of the sovereign that owns the river, I would sustain Maryland's exceptions to the Report of the Special Master and enter judgment dismissing Virginia's complaint.

JUSTICE KENNEDY, with whom JUSTICE STEVENS joins, dissenting.

Failing to appreciate a basic rule of territorial adjudication, the Court concludes it must "reject Maryland's historical premise" that in 1785 the State had title to the Potomac River (River), its bed, and its waters. *Ante*, at 67. In my respectful view, and contrary to the majority's premise, the circumstance that two parties both claim rights to a parcel of land has no legal significance if one of the two parties has clear title already, absent some further argument that the claim against the holder of the title is reinforced by a history of prescription, estoppel, or adverse use. Contra, *ante*, at 68 (relying on the fact that "the scope of Maryland's sovereignty over the River was in dispute both before and after the 1785 Compact" to conclude that Maryland lacked sovereignty over the River in 1785). Just as this basic rule of property adjudication is true of disputes between two private persons, it is true of title disputes between States. "No court acts differently in deciding on boundary between states, than on lines between separate tracts of land." *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 733 (1838). See also *Rhode Island* v. *Massachusetts*, 4 How. 591, 628

(1846) ("[A]scertain[ing] and determin[ing] the boundary in dispute . . . , disconnected with the consequences which follow, is a simple question, differing little, if any, in principle from a disputed line between individuals"). Cf. *Alabama* v. *Georgia*, 23 How. 505 (1860) (settling quiet title action between States by engaging in traditional quiet title analysis).

Since "[t]here is not in fact, or by any law can be, any territory which does not belong to one or the other state; so that the only question is, to which the territory belongs," 12 Pet., at 732, a competent authority's determination that a sovereign's title lies clear and unimpaired necessarily has retrospective force. This is so despite the losing sovereign's prior attempt to gain what was not its own.

The majority, in the face of these doctrines and precedents, nonetheless relies on the proposition that Maryland's historical title is to be doubted because Virginia long disputed it and the parties undertook to resolve the dispute. It is a curious proposition to suggest that by submitting to adjudication, arbitration, or compact negotiations a party concedes its rights are less than clear. The opposite inference is just as permissible. The implication of the majority's principle, moreover, is that self-help and obdurate refusal to submit a claim to resolution have some higher standing in the law than submission of disputes to a competent authority.

Until today, the competent authorities to whom Maryland and Virginia submitted their dispute have been clear and unanimous on this point: As of 1784, the year before the Compact, the Governor of Virginia could not enter the waters of the Potomac to cool himself by virtue of any title Virginia then had to the riverbed. Title to the whole River, and its bed, was in Maryland. First, in 1877, the parties agreed, with later congressional approval, that Maryland had clear title to the whole River dating from 1632. See Black-Jenkins Opinion (1877), App. to Report of Special Master, p. D–9 (hereinafter App. to Report of Special Master) ("The intent of the [original 1632 Maryland] charter is manifest all

through to include the whole river within Lord Baltimore's grant"). Then, as if this 1877 determination were not enough, this Court independently reviewed the question in 1899. The Court, too, reached the conclusion that Maryland had clear title to the whole River dating from 1632. The Court said, "the grant to Lord Baltimore, in unmistakable terms, included the Potomac River." *Morris* v. *United States*, 174 U. S. 196, 223 (1899). And the Court confirmed this determination in 1910. See *Maryland* v. *West Virginia*, 217 U. S. 1, 45–46. Thus, unless prescription had been worked by some previous conduct to give Virginia at least some limited rights, in 1784 Maryland had clear title to the whole River, as much as in 1632.

Neither Virginia's counsel nor the majority of the Court today contends that prescription occurred prior to the Compact of 1785. In 1784, therefore, under the law, Virginia had little more than a land border between it and Maryland in the area here under consideration; Virginia did not have a river border since the River was not its own. That in 1784 Virginia did not admit Maryland's clear title to this territory and was unwilling to comply with Maryland's continuing and consistent demands that it respect Maryland's sovereign control over the River did not cloud the smooth stretch of Maryland's title back to 1632.

Whether the Governor of the Commonwealth, in 2003, may cool himself in the River—or in this case, build a water pipe for the benefit of communities not on the riverbank—without so much as an "if you please" to the State of Maryland entirely depends upon whether in the intervening time since 1784 Maryland has in some way ceded its sovereignty over the River. See *United States* v. *Cherokee Nation of Okla.*, 480 U. S. 700, 707 (1987) ("[A] waiver of sovereign authority will not be implied, but instead must be 'surrendered in unmistakable terms'"); 12 Pet., at 732 ("[T]itle, jurisdiction, and sovereignty, are inseparable incidents, and remain so till the state makes some cession").

Virginia asserts that an agreement and an award set out in two documents establish that Maryland ceded Virginia an unqualified right to enter upon Maryland's territory. The case, therefore, turns on these two documents: the 1785 Compact between the two States and their 1877 arbitrated award (Black-Jenkins Award or Award).

Via the 1785 Compact, Article Seventh, both States promised the other rights to use the River that presuppose neither could exclude the other from the River.

> "The citizens of each state respectively shall have full property in the shores of Potowmack river adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river." Va. Code Ann. Compacts App., pp. 342–343 (Lexis 2001).

Thus, in effect, they gave one another assurances of River access in exchange for the identical, reciprocal pledge. The mutual promise was sensible enough since at the time both parties claimed to own the whole River, and equally, therefore, neither accepted the other's claim to have any right to gain access to the River. The Compact, in essence, was a predictable and intelligent hedging agreement (protecting both from the danger that at some later point the other's claim to full and clear title would be confirmed by a competent legal authority).

Once it was established by a competent legal authority that Maryland had clear title to the whole River, the terms of Article Seventh of the Compact, in retrospect, became the sole fount of Virginia's right to River access. The terms by which the parties promised River access to one another became relevant, as one would expect from a hedging agreement, after occurrence of the development the parties hedged against.

Maryland, as the territory's sovereign, once could have excluded Virginia landowners from the River, but Article Seventh abrogates Maryland's right of sovereignty to this extent. By its clear language, Article Seventh creates a right for citizen landowners to have some access to the River territory by, for example, the construction of improvements appurtenant to the shore.

Article Seventh, however, does not abrogate Maryland's sovereign right to exercise its police power, and the regulatory authority that implies, over its River territory; and the majority does not contend otherwise. The citizen landowner rights created by Article Seventh, as a consequence, remain subject to Maryland's sovereign powers insofar as that consists with Virginia's guaranteed access. That the landowners' rights are so limited is well illustrated by the very different language the parties used when they wanted to abrogate one another's police power over citizens or the other State. For example, as the majority agrees, Articles Fourth, Eighth, and Ninth of the Compact all contain express and particular police power abrogations. See *ante*, at 66–67. So does Article Tenth. Article Seventh, however, stands in clear contrast to these provisions. It does not contemplate the transfer or abrogation of Maryland's police power. It cannot be the basis for concluding that Virginia's citizens now have not just a right of access to the River, but the additional right of access free of Maryland's regulatory police power. See *Massachusetts* v. *New York*, 271 U. S. 65, 89 (1926) ("[D]ominion over navigable waters, and property in the soil under them, are so identified with the exercise of the sovereign powers of government that a presumption against their separation from sovereignty must be indulged").

As a result, Article Seventh sets up an awkward situation, forcing this Court to reconcile a landowner right not to be excluded with Maryland's sovereign regulatory authority. In effect, it forces the Court to inquire whether any particu-

lar regulation amounts instead to an exclusion prohibited by the Compact. That the Compact forces this determination, parallel to that at issue in a case of an overburdened easement, is no reason to deny its plain language or the accepted proposition that Maryland has long had title to the River and its bed.

The next step is to consider the 1877 Black-Jenkins Award and to ask whether that Award expands Virginia's rights of River access beyond what was provided in the Compact. The Black-Jenkins Award affirms that Virginia, as much as its citizens, has riparian rights under the 1785 Compact, to the extent of the Commonwealth's own riparian ownership. See *ante*, at 69. The question remains, however, whether Black-Jenkins converted Virginia's right of riparian ownership under Article Seventh to a right of sovereignty in the waters. For, if it did not do so, then Virginia's right of access to the River is limited like that of any other riparian owner under Article Seventh. In relevant part, the Award states:

> "Fourth. Virginia is entitled not only to full dominion over the soil to low-water mark on the south shore of the Potomac, but has a right to such use of the river beyond the line of low-water mark as may be necessary to the full enjoyment of her riparian ownership, without impeding the navigation or otherwise interfering with the proper use of it by Maryland, agreeably to the compact of seventeen hundred and eighty-five." Act of Mar. 3, 1879, ch. 196, 20 Stat. 482 (internal quotation marks omitted).

The majority suggests this language gives Virginia sovereign rights to the River because it uses the words "Virginia" and "full dominion." See *ante*, at 72 ("The arbitrators did not differentiate between Virginia's dominion over the soil and her right to construct improvements beyond low-water mark"). That reading cannot be right for two reasons.

First, the evident design of Paragraph Fourth is to acknowledge a Virginia access right parallel to that of its own citizens who were riparian landowners. Paragraph Fourth sets out two recitations, and they are in contradistinction. Virginia is granted "full dominion" up to the low-water line. This is unlimited. What comes next is not. As to the rights beyond this full dominion, that is to say beyond the low-water line, Virginia has only the rights of a riparian owner. If the arbitrators meant to set the two rights in parallel, as Virginia argues, they would not have used the word "but" to distinguish them. Further, the phrase "a right to such use" is limited by the phrase "riparian ownership." This is far different from saying Virginia has full dominion "up to the low-water line, and with respect to" any improvements it makes appurtenant to its shore.

Second, Black-Jenkins states that the limited rights Virginia has, the Commonwealth achieved by prescription. Maryland acquiesced to Virginia's adverse use, Black-Jenkins says, as a result of Maryland's adherence to Article Seventh of the Compact.

> "Virginia, from the earliest period of her history, used the South bank of the Potomac as if the soil to low water-mark had been her own. She did not give this up by her Constitution of 1776, when she surrendered other claims within the charter limits of Maryland; but on the contrary, she expressly reserved 'the property of the Virginia shores or strands bordering either side of said rivers, (Potomac and Pocomoke,) and all improvements which have or will be made thereon.' By the compact of 1785, Maryland assented to this, and declared that 'the citizens of each State respectively shall have full property on the shores of Potomac . . . and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements.' We are not authority for the construction of this compact, because nothing which concerns it is submitted to

us . . . . Taking all together, we consider it established
that Virginia has a proprietory right on the south shore
to low water-mark, and, appurtenant thereto, has a priv-
ilege to erect any structures connected with the shore
which may be necessary to the full enjoyment of her
riparian ownership, and which shall not impede the free
navigation or other common use of the river as a public
highway." App. to Report of Special Master D–18 to
D–19 (quoting Article Seventh of the Compact).

That Maryland's "assent" and "declaration" in the Compact
prove Maryland's acquiescence in Black-Jenkins' prescription
analysis illustrates the limits of the Award: The prescriptive
rights it recognized stemmed from the Compact. Virginia's
claims under Black-Jenkins rise as high as the Compact but
no higher. The Commonwealth can do no more than assert
those rights granted to landowners by Article Seventh.

The above analysis, of course, does not depend on the conclu-
sion that Maryland's acquiescence was the sole basis for the
Black-Jenkins Award, as the majority contends. See *ante,*
at 75. A factor in any test can be a necessary, though not
sufficient, element. Here, the arbitrators' express aim was
to apply "[u]sucaption, prescription, or the acquisition of title
founded on long possession, uninterrupted and undisputed,"
which they noted were intended to help sovereigns avoid the
"bloody wars" that territorial disputes occasion. See App.
to Report of Special Master D–17 to D–18. The inquiry into
acquiescence (*i. e.,* whether the territory was disputed) fits
into that analytical framework as a necessary, though not
sole, factor. The other factors, such as Virginia's long use,
were also necessary, though not sole, factors. This explains
why the arbitrators said Virginia's long use and Maryland's
acquiescence were "Tak[en] all together." See *id.,* at D–19.
It also explains why the text of the Award—which after all
is of greater significance than the arbitrator's attached opin-
ion—distinguishes between Virginia's full dominion up to the

low-water line and its use rights beyond that point, a distinction consistent with Article Seventh.

The majority's decision ultimately seems to rely on rights stemming from some other, additional prescription to conclude that Paragraph Fourth expands Virginia's rights. See *ante*, at 74. It fails to explain, however, what other rights Black-Jenkins identified other than those achieved by the prescription discussed above. Notwithstanding the majority's conclusory position, the sole right acknowledged in Black-Jenkins was that which was delimited by the operation of Article Seventh

The majority also implies, in footnote 9 of its opinion, that Virginia's right to use the River free from Maryland's regulation is equally a matter of federal common law. See *ante*, at 74–75, n. 9 (relying on *Colorado* v. *New Mexico*, 459 U. S. 176 (1982)). That suggestion cannot be right, however. The doctrine on which the majority relies pertains to interstate bodies of water. As explained above, the Potomac River belongs to Maryland and so is not an interstate body of water. Those cases in which we have considered the common-law rights of sovereigns who either both had title to half of a river, or who both had full title to a river but at different points in its flow, such as *Colorado*, are inapposite to this unique, sole-title context.

Since Black-Jenkins does not expand Virginia's right of access, Article Seventh's framework controls. The awkwardness of asking whether a regulation by Maryland amounts to exclusion is heightened here, where Virginia, as a riparian landowner, asserts its right to have access to the River for the purpose of serving needs well beyond recognized riparian use. This, in turn, raises the question whether Maryland can decide Virginia has too much population, and on that ground deny Virginia access for the purpose of meeting water demands.

This, to be sure, is a question of considerable difficulty, for it is not our law or our constitutional system to allow one

State to regulate transactions occurring in another or to project its legislative power beyond its own borders. See *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511, 523 (1935). Virginia's access rights, though not rights of sovereignty, are rights held by a sovereign, which Maryland well knew when it signed the Compact. And, nothing in the Compact gives Maryland the power to regulate the Commonwealth of Virginia as most States can regulate their own riparian landowners; specifically, Paragraph Fourth of the Award (like Article Seventh of the Compact) prohibits Maryland from excluding Virginia from the River. These considerations counsel careful deliberation before deciding whether Maryland regulation amounts to an exclusion in light of the particular riparian use at issue.

Determining whether a regulation is either (1) a legitimate River regulation of riparian use, or (2) a wrongful exclusion, under the Compact, of the riparian owner from the River, may implicate some limitations based on a reasonable prediction of consequences to the River's flow. That is the question that Virginia should have submitted to the Special Master. The majority, however, simply holds that Virginia has a right to gain access to and enjoy the River coextensive with Maryland's own. Its ruling denies the force of the historical documents at issue. It has no logical basis either, unless the majority also makes the silent assumption that Virginia is constrained by some principle of reasonableness. The majority's interpretation, that Virginia's right is whole, sovereign, and unobstructed, otherwise leads to the conclusion that Virginia could build all the way across the River if the Commonwealth so chooses, as long as the Commonwealth itself concludes the construction is an improvement appurtenant to its shoreline and not an obstruction to the River's navigability.

The anomaly that exists because of the rather unusual circumstance that Maryland owns the entirety of the River affects this case's difficulty; but it does not affect the fact that

the Court must confront the problem, not ignore it and send Maryland and its rights away by fiat. This is particularly true in light of the fact that Virginia's right to access and Maryland's right to regulate have coexisted in actual application for nearly 50 years. See *ante,* at 63. History shows the framework can be workable.

If Maryland's attempted regulation of Virginia contradicts Virginia's place in the federal system, that matter can be explored from case to case. Here, however, the Commonwealth did not ask the Special Master, as it should have, to consider whether, given the nature of the riparian rights at issue, see *ante,* at 81–82 (STEVENS, J., dissenting), the effect of the proposed use on the River, and the attempted regulation at issue, Maryland has in effect excluded Virginia from its rightful riparian use, as distinct from enacting reasonable regulations of that use. Virginia is not due the broad relief it instead now receives: the majority's declaration that Virginia is the sovereign of whatever Maryland territory appurtenant to Virginia's shoreline Virginia now chooses to claim. In agreement with JUSTICE STEVENS, I would sustain Maryland's objections to the Report of the Special Master and enter judgment dismissing Virginia's complaint. For these reasons, with respect, I dissent.