## O'CONNOR ET UX. v. UNITED STATES

No. 85–558.   Argued October 14, 1986—Decided November 4, 1986*

---

*Together with No. 85–559, *Coplin et ux.* v. *United States*, and No. 85–560, *Mattox et ux.* v. *United States*, also on certiorari to the same court.

28

SCALIA, J., delivered the opinion for a unanimous Court.

*Carter G. Phillips* argued the cause for petitioners in all cases. On the briefs were *Andrew C. Barnard, David J. Kiyonaga, Allan I. Mendelsohn, Marvin I. Szymkowicz, John C. Morrison, George S. Barnard, Michael C. Pierce,* and *Dwight A. McKabney.*

*Jerrold J. Ganzfried* argued the cause for the United States. With him on the brief were *Solicitor General Fried, Assistant Attorney General Olsen, Deputy Solicitor General Wallace, Michael L. Paup, David English Carmack,* and *Abraham D. Sofaer.*

JUSTICE SCALIA delivered the opinion of the Court.

The petitioners, United States citizen employees of the Panama Canal Commission and their spouses, seek refunds of income taxes collected on salaries paid by the Commission between 1979 and 1981. We granted certiorari to resolve conflicting appellate interpretations of an international agreement. 474 U. S. 1050 (1986).

From 1904 to 1979, the United States exercised sovereignty over the Panama Canal and the surrounding 10-mile-wide Panama Canal Zone under the Isthmian Canal Convention, 33 Stat. 2234. On September 7, 1977, the United States and Panama signed the Panama Canal Treaty, T.I.A.S. No. 10030, which was ratified by the Senate on April 17, 1978, and took effect on October 1, 1979. The Treaty transferred to Panama sovereignty over the Canal and Zone, but gave the United States the right to operate the Canal until December 31, 1999. The vehicle for United States administration of the Canal is the Panama Canal Commission, a United States Government agency supervised by a Board of nine members, four of whom are Panamanian nationals proposed by the Government of Panama. See 22

T.I.A.S. No. 10031 (hereinafter Agreement), contains the provision that gives rise to the present dispute. Article XV of the Agreement, entitled "Taxation," provides as follows:

"1. By virtue of this Agreement, the Commission, its contractors and subcontractors are exempt from payment in the Republic of Panama of all taxes, fees or other charges on their activities or property.

"2. United States citizen employees and dependents shall be exempt from any taxes, fees or other charges on income received as a result of their work for the Commission. Similarly, they shall be exempt from payment of taxes, fees or other charges on income derived from sources outside the Republic of Panama.

"3. United States citizen employees and dependents shall be exempt from taxes, fees or other charges on gifts or inheritance or on personal property, the presence of which within the territory of the Republic of Panama is due solely to the stay therein of such persons on account of their or their sponsor's work with the Commission.

"4. The Coordinating Committee may establish such regulations as may be appropriate for the implementation of this Article."

The petitioners contend that § 2 of this Article constitutes an express exemption of their Commission salaries from both Panamanian and United States taxation. See 26 U. S. C. § 894(a) ("Income of any kind, to the extent required by any treaty obligation of the United States, shall not be included in gross income and shall be exempt from taxation under this subtitle"). The Claims Court agreed, 6 Cl. Ct. 115 (1984), but was reversed by a five-judge panel of the Federal Circuit. 761 F. 2d 688 (1985). In a substantively identical case, the Eleventh Circuit has ruled for the taxpayers. *Harris* v. *United States*, 768 F. 2d 1240 (1985), cert. pending,

No. 85–1011.   The same issue is presented in numerous cases still pending in the lower courts.[1]

We agree with the Federal Circuit.   The first section of Article XV, which confers upon the Commission and its contractors an exemption "from payment *in the Republic of Panama* of all taxes" (emphasis added), establishes the context for the discussion of tax exemptions in the entire Article—so that when §§ 2 and 3 state that "United States citizen employees . . . shall be exempt" from taxes they are understood to be dealing only with taxes payable in Panama.   In that regard the structure of Article XV is similar to that of Article XVI, which in most of its sections speaks generally of import duties, but is understood to refer only to *Panamanian* import duties principally because § 1 sets the stage in that fashion by referring to "the customs laws and regulations *of the Republic of Panama.*"   Agreement, Art. XVI, § 1 (emphasis added).

There is some purely textual evidence, albeit subtle, of the understanding that Article XV applies only to Panamanian taxes: In conferring an exemption from property taxes, § 3 displays an assumption that only personal property within the Republic of Panama is at issue; otherwise, that significant qualification to the operation of § 3 would more naturally have been set forth as an explicit limitation ("personal property

---

[1] After this case was argued, the President signed into law the Tax Reform Act of 1986, Pub. L. 99–514, 100 Stat. 2085.   Section 1232(a) of that Act provides, in relevant part, that for "all taxable years whether beginning before, on, or after the date of the enactment of this Act (or in the case of any tax not imposed with respect to a taxable year, [for] taxable events after the date of enactment of this Act," no provision of the Treaty or Agreement "shall be construed as exempting (in whole or in part) any citizen or resident of the United States from any tax under the Internal Revenue Code of 1954 or 1986."   Because we find that the Agreement, properly interpreted, provides for the same result, we do not rely upon the statute, and thus avoid confronting the constitutional questions posed by retroactive income taxation.   See *United States* v. *Darusmont*, 449 U. S. 292, 296–301 (1981); *Welch* v. *Henry*, 305 U. S. 134, 146–151 (1938).

*within the territory of the Republic of Panama,* whose presence there," etc.) rather than being referred to incidentally in the modifying clause ("personal property, whose presence within the territory of the Republic of Panama," etc.). And the assumption that only personal property within Panama is at issue in turn reflects the more fundamental assumption that only *Panamanian* personal property taxes are being addressed.

More persuasive than the textual evidence, and in our view overwhelmingly convincing, is the contextual case for limiting Article XV to Panamanian taxes. Unless one posits the ellipsis of failing to repeat, in each section, § 1's limitation to taxes "in the Republic of Panama," the Article takes on a meaning that is utterly implausible and has no foundation in the negotiations leading to the Agreement. For if the first sentence of § 2 refers to United States as well as Panamanian taxes, then the second sentence of § 2, and the totality of § 3, must do so as well—with the consequence that United States citizen employees and their dependents would be exempt not only from United States income tax on their earnings from the Commission, but also from United States income tax on all income from sources outside Panama (*e. g.,* United States bank accounts), and from all United States gift and inheritance taxes. While, as the petitioners assert, there might have been some reason why Panama would insist that its inability to tax United States citizen Commission employees upon their earnings in Panama be matched by a detraction from the United States' sovereign power to tax those same earnings, there is no conceivable reason why this hypothetical "your-sovereignty-for-mine" negotiating strategy would escalate into a demand that the United States yield more sovereign prerogatives than it was asking Panama to forgo—and no imaginable reason why the United States would accept such an escalation, producing tax immunity of unprecedented scope.

32

from the United States' sovereign power to tax those same earnings, there is no conceivable reason why this hypothetical "your-sovereignty-for-mine" negotiating strategy would escalate into a demand that the United States yield more sovereign prerogatives than it was asking Panama to forgo—and no imaginable reason why the United States would accept such an escalation, producing tax immunity of unprecedented scope.

The petitioners' attempts to explain why these broader tax consequences need not follow from their interpretation are unpersuasive. With regard to the second sentence of § 2, they argue that the opening word "similarly" should be read to incorporate into that sentence the first sentence's restriction to "income received as a result of . . . work for the Commission." On this understanding, the second sentence provides a "simila[r]" tax exemption for Commission-related income "derived from sources outside the Republic of Panama," but allows both countries to tax non-Commission income. In addition to being an unnatural reading of "similarly" in this context, this interpretation is flatly inconsistent with the language of § 2. Contrary to the petitioners' tacit assumption, the first sentence contains nothing limiting the scope of its exemption to income received as a result of work for the Commission *in Panama*. A person receiving a Commission salary for work performed in, for example, Bogotá would seem plainly to qualify for exemption under this provision—rendering the second sentence, on the petitioners' understanding, superfluous. With regard to § 3, the petitioners assert that its reference to taxation of property "within the territory of the Republic of Panama" is sufficient to demonstrate that only Panamanian taxation is intended to be covered. But as a reading of the provision will readily demonstrate, that reference applies only to personal property taxes; there is no comparable qualification on § 3's exemption from taxes "on gifts or inheritance." That is limited, if at all, only by the implication that Panamanian

taxes alone are at issue. In sum, we find the verbal distortions necessary to give plausible content, under the petitioners' theory, to the second sentence of §2 and §3, far less tolerable than the acknowledgment of ellipsis which forms the basis of the Government's interpretation.

Not only is limitation of Article XV to Panamanian taxes in accord with the consistent application of the Agreement by the Executive Branch—a factor which alone is entitled to great weight, see *Sumitomo Shoji America, Inc.* v. *Avagliano,* 457 U. S. 176, 184–185 (1982)—but that application has gone unchallenged by Panama. It is undisputed that, pursuant to clear Executive Branch policy, the Panama Canal Commission consistently withheld United States income taxes from petitioners and others similarly situated, see Letter from John L. Haines, Jr., Deputy General Counsel, Panama Canal Commission, to David Slacter, United States Department of Justice, Dec. 20, 1982, pp. 2–3, 1 App. in Nos. 85–504, 85–505, 85–506, and 85–507 (CA Fed.), pp. 61–62, and that Panama, which had four of its own nationals on the Board of the Commission, did not object. The course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning. See *Trans World Airlines, Inc.* v. *Franklin Mint Corp.,* 466 U. S. 243, 259–260 (1984); *Pigeon River Improvement, Slide & Boom Co.* v. *Charles W. Cox, Ltd.,* 291 U. S. 138, 158–161 (1934). Cf. Uniform Commercial Code §2–208(1) (1978).[2]

---

[2] The Government has contended, here and before the Court of Appeals, that the answer to the current question is illumined, if not conclusively determined, by a February 22, 1985, diplomatic note from the Government of Panama, indicating that it shares the United States' view that Article XV pertains only to Panamanian taxation. The petitioners assert that mutual agreement between the contracting parties on interpretation cannot be dispositive of third-party rights, and that the note is in any event inadmissible on various grounds. Since we would sustain the Government's position without reference to the note, we need not resolve these disputes.

Agreement.    Similarly, *as is provided by Panamanian law*, they shall be exempt from payment of taxes, fees or other charges on income derived from sources outside the Republic of Panama."    Panama Canal Treaty: Implementation of Article IV, Sept. 7, 1977, Art. XVI, § 2, T.I.A.S. No. 10032 (emphasis added).

The petitioners contend that the variation in the phraseology of the two provisions demonstrates that the taxation provisions of the Article III Agreement were meant to be bilateral.    We think not.    It would be another matter if the variation at issue were alteration of the phrase "Panamanian taxes" in one agreement to merely "taxes" in the other; there would have been no reason to object to the former formulation *except* the belief that more than Panamanian taxes were covered.    Several plausible reasons, however, would justify objection to the phrase "as is provided by Panamanian law."    The most obvious is the concern that the phrase would be interpreted to leave future scope of the tax exemption within Panama's unilateral control, through the amendment of its domestic law.    (To be sure, that reason would seemingly call for deletion of the phrase from both agreements rather than merely the Agreement in Implementation of Article III—but perhaps it was only with respect to the latter agreement, in which Panama had steadfastly opposed the whole concept of tax exemption, that unilateral Panamanian action was feared.)    The surmise that the reason for deletion of the phrase in the Article III Agreement was its implication that only Panamanian taxes were covered would perhaps be reasonable if it were clear that the deletion was prompted by Panama.    In fact, however, the deletion was made in the course of the American side's own internal drafting, before any text had even been presented to the Panamanians.    (The phrase "as is provided by Panamanian law" was included in the June 26, 1977, United States draft of § 2 of Art. XV, 1 App. in Nos. 85–504, 85–505, 85–506, and 85–507 (CA Fed.), p. 74, but was dropped from subsequent United States

only Panamanian taxes were covered would perhaps be reasonable if it were clear that the deletion was prompted by Panama. In fact, however, the deletion was made in the course of the American side's own internal drafting, before any text had even been presented to the Panamanians. (The phrase "as is provided by Panamanian law" was included in the June 26, 1977, United States draft of §2 of Art. XV, 1 App. in Nos. 85–504, 85–505, 85–506, and 85–507 (CA Fed.), p. 74, but was dropped from subsequent United States drafts, *id.*, at 77, 81.) The petitioners assert that this occurred as a consequence of the American side's knowledge that Panama would not accept a unilateral tax exemption provision and would accept a bilateral one—but they point to no Panamanian negotiating proposal supporting that speculation, which seems to us not inordinately credible on its face.

We find the petitioners' attempted reliance upon other elements of the negotiating history unavailing. While the Claims Court may have been correct that the negotiating history does not favor the Government's position sufficiently to overcome what that court regarded as a plain textual meaning in favor of the taxpayers, it certainly does not favor the taxpayers' position sufficiently to affect our view of the text. It contains, we may note, only a single (unhelpful) reference to United States income taxation—a silence that can perhaps be reconciled with the petitioners' position, but can hardly be said affirmatively to support it.

Finally, we find no significance in the fact, urged so strongly by the petitioners, that Article XV is entitled "Taxation" rather than "Panamanian Taxation." Of the 21 Articles of the Agreement, only 2—Articles V and IX—are limited by title to Panamanian subject matter, though it is plain that most are so limited in their application. See, *e. g.*, Article VII ("Water Rights"); Article XII ("Entry and Departure"); Article XVI ("Import Duties").

The judgment of the Court of Appeals is

*Affirmed.*