Justice Ginsburg
delivered the opinion of the Court.
The States of Delaware and New Jersey seek this Court’s resolution of a dispute concerning their respective regulatory authority over a portion of the Delaware River within a circle of twelve miles centered on the town of New Castle, *602 Delaware. In an earlier contest between the two States, this Court upheld the title of Delaware to “the river and the subaqueous soil” within the circle “up to [the] low water mark on the easterly or New Jersey side.” New Jersey v. Delaware, 291 U. S. 361, 385 (1934) (New Jersey v. Delaware II)[1] Prior to that 1934 boundary determination, in 1905, the two States had entered into an accord (1905 Compact or Compact), which Congress ratified in 1907. The Compact accommodated both States’ concerns on matters over which the States had crossed swords: service of civil and criminal process on vessels and rights of fishery within the twelve-mile zone. Although the parties were unable to reach agreement on the interstate boundary at that time, the 1905 Compact contained two jurisdictional provisions important to the current dispute:
“Art. VII. Each State may, on its own side of the river, continue to exercise riparian jurisdiction of every kind and nature, and to make grants, leases, and conveyances of riparian lands and rights under the laws of the respective States.
“Art. VIII. Nothing herein contained shall affect the territorial limits, rights, or jurisdiction of either State of, in, or over the Delaware River, or the ownership of the subaqueous soil thereof, except as herein expressly set forth.” Act of Jan. 24, 1907, 34 Stat. 860.
The controversy we here resolve was sparked by Delaware’s refusal to grant permission for construction of a liquefied natural gas (LNG) unloading terminal that would extend some 2,000 feet from New Jersey’s shore into territory New Jersey v. Delaware II adjudged to belong to Delaware. The LNG plant, storage tanks, and other structures would be *603 maintained onshore in New Jersey. Relying on Article VII of the 1905 Compact, New Jersey urged that it had exclusive jurisdiction over all projects appurtenant to its shores, including wharves extending past the low-water mark on New Jersey’s side into Delaware territory. Delaware asserted regulatory authority, undiminished by Article VII, over structures located within its borders; in support, Delaware invoked, inter alia, Article VIII of the 1905 Compact and our decision in New Jersey v. Delaware II. The Special Master we appointed to superintend the proceedings filed a report recommending a determination that Delaware has authority to regulate the proposed construction, concurrently with New Jersey, to the extent that the project reached beyond New Jersey’s border and extended into Delaware’s domain.
We accept the Special Master’s recommendation in principal part. Article VII of the 1905 Compact, we hold, did not secure to New Jersey exclusive jurisdiction over all riparian improvements commencing on its shores.[2] The parties’ own conduct, since the time Delaware has endeavored to regulate coastal development, supports the conclusion to which other relevant factors point: New Jersey and Delaware have overlapping authority to regulate riparian structures and operations of extraordinary character extending outshore of New Jersey’s domain into territory over which Delaware is sovereign.
I
Disputes between New Jersey and Delaware concerning the boundary along the Delaware River (or River) separating the two States have persisted “almost from the beginning of statehood.” New Jersey v. Delaware II, 291 U. S., at 376. The history of the States’ competing claims of sovereignty, *604 rehearsed at length in New Jersey v. Delaware II, need not be detailed here. In brief, tracing title through a series of deeds originating with a 1682 grant from the Duke of York to William Penn, Delaware asserted dominion, within the twelve-mile circle, over the River and its subaqueous lands up to the low-water mark on the New Jersey side. Id., at 364, 374.[3] New Jersey claimed sovereign ownership up to the middle of the navigable channel. Id., at 363-364.
The instant proceeding is the third original action New Jersey has commenced against Delaware involving the Delaware River boundary between the two States. The first action, New Jersey v. Delaware, No. 1, Orig. (filed 1877) (New Jersey v. Delaware I), was propelled by the States’ disagreements over fishing rights. See Report of Special Master 3 (Report).[4] That case “slumbered for many years.” New Jersey v. Delaware II, 291 U. S., at 377. Eventually, the parties negotiated a Compact, which both States approved in 1905, and Congress ratified in 1907. See Act of Jan. 24,1907, ch. 394, 34 Stat. 858. Modest in comparison to the parties’ initial aim, the Compact left location of the interstate boundary an unsettled question.[5]
[6]New Jersey then withdrew its *605 complaint and this Court dismissed the case without prejudice. New Jersey v. Delaware I, 205 U. S. 550 (1907).
The second original action, New Jersey v. Delaware II, was fueled by a dispute over ownership of an oyster bed in the River below the twelve-mile circle. See Report 14. In response to New Jersey’s complaint, the Court conclusively settled the boundary between the States. Confirming the Special Master’s report, the Court held that, within the twelve-mile circle, Delaware owns the River and the sub-aqueous soil up to the low-water mark on the New Jersey side. 291 U. S., at 385.[6] But New Jersey gained the disputed oyster bed: South of the circle, the Court adjudged the boundary “to be the middle of the main ship channel in Delaware River and Bay.” Ibid. See also New Jersey v. Delaware II, 295 U. S. 694, 699 (1935) (Decree) (perpetually enjoining the States from further disputing the boundary).
In upholding Delaware’s title to the area within the twelve-mile circle, the Court rejected an argument pressed by New Jersey based on the 1905 Compact: By agreeing to the Compact, New Jersey urged, Delaware had abandoned any claim of ownership beyond the middle of the River. The Court found New Jersey’s argument “wholly without force.” 291 U. S., at 377. “The compact of 1905,” the Court declared, “provides for the enjoyment of riparian rights, for concurrent jurisdiction in respect of civil and criminal process, and for concurrent rights of fishery. Beyond that it does not go.” Id., at 377-378. The Court next recited in full the text of Article VIII of the Compact: “Nothing herein contained shall affect the territorial limits, rights, or jurisdiction of either State of, in, or over the Delaware River, or the ownership of the subaqueous soil thereof, except as herein *606 expressly set forth.” Id., at 378 (internal quotation marks omitted).
II
The current controversy arose out of the planned construction of facilities to import, store, and vaporize foreign-source LNG; the proposed project would be operated by Crown Landing, LLC, a wholly owned subsidiary of British Petroleum (BP). See Report 19; 6 App. of Delaware on Cross-Motions for Summary Judgment 3793, 3804-3807 (hereinafter Del. App.) (Request for Coastal Zone Status Decision). The “Crown Landing” project would include a gasification plant, storage tanks, and other structures onshore in New Jersey, and a pier and related structures extending some 2,000 feet from New Jersey’s shore into Delaware. Report 19-20; 6 Del. App. 3804. Supertankers with capacities of up to 200,000 cubic meters (more than 40 percent larger than any ship then carrying natural gas) would berth at the pier. Id., at 3810.[7] A multipart transfer system — including, inter alia, cryogenic piping, a containment trough, and utility lines — would be installed on the 6,000-square-foot unloading platform and along the pier to transport the LNG (at sufficiently cold temperatures to keep it in a liquid state) from ships to three 158,000-cubic-meter storage tanks onshore; vapor byproducts resulting from the onshore gasification would be returned to the tankers. Report 19-20; 6 Del. App. 3804; 7 id., at 4307 (Cherry Affidavit). Even “[djuring the holding mode of terminal operation (when no ship is unloading),” LNG would circulate through the piping along the pier to “keep the line cold.” 6 id., at 3804. Construction of *607 the Crown Landing project would require dredging 1.24 million cubic yards of subaqueous soil, affecting approximately 29 acres of the riverbed within Delaware’s territory. Report 19-20.[8]
In September 2004, BP sought permission from Delaware’s Department of Natural Resources and Environmental Control (DNREC) to construct the Crown Landing unloading terminal. See id., at 20.[9] DNREC refused permission some months later on the ground that the terminal was barred by Delaware’s Coastal Zone Act (DCZA), Del. Code Ann., Tit. 7, § 7001 et seq. (2001),[10] as a prohibited “offshore . . . bulk product transfer facility] ” as well as a prohibited “[hjeavy industry us[e],” § 7003; Report 20.[11]
Reactions to DNREC’s decision boiled over on both sides. New Jersey threatened to withdraw state pension funds from Delaware banks, and Delaware considered authorizing the National Guard to protect its border from encroachment. *608 See Report 21. One New Jersey legislator looked into recommissioning the museum-piece battleship U. S. S. New Jersey, in the event that the vessel might be needed to repel an armed invasion by Delaware. See ibid.
New Jersey commenced the instant action in 2005, seeking a declaration that Article VII of the 1905 Compact establishes its exclusive jurisdiction “to regulate the construction of improvements appurtenant to the New Jersey shore of the Delaware River within the Twelve-Mile Circle, free of regulation by Delaware.” Motion to Reopen and for Supplemental Decree 35; see Report 22, 29. We granted leave to file a bill of complaint. 546 U. S. 1028 (2005). Delaware opposed New Jersey’s reading of Article VII, and maintained that the 1905 Compact did not give New Jersey exclusive authority to “approve projects that encroach on Delaware submerged lands without any say by Delaware.” Brief for Delaware in Opposition to New Jersey’s Motion to Reopen and for Supplemental Decree 21; see Report 23, 29.
The Special Master appointed by the Court, Ralph I. Lancaster, Jr., 546 U. S. 1147 (2006), superintended discovery and carefully considered nearly 6,500 pages of materials presented by the parties in support of cross-motions for summary judgment. Report 27. He ultimately determined that the “riparian jurisdiction” preserved to New Jersey by Article VII of the 1905 Compact “is not exclusive” and that Delaware “has overlapping jurisdiction to regulate . . . improvements outshore of the low water mark on the New Jersey side of the River.” Id., at 32. New Jersey filed exceptions to which we now turn.[12]
*609 III
At the outset, we summarize our decision and the principal reasons for it. In accord with the Special Master, we hold that Article VII of the 1905 Compact does not grant New Jersey exclusive jurisdiction over all riparian improvements extending outshore of the low-water mark. First, the novel term “riparian jurisdiction,” which the parties employed in the Compact, is properly read as a limiting modifier and not as synonymous with “exclusive jurisdiction.” Second, an 1834 compact between New Jersey and New York casts informative light on the later New Jersey-Delaware accord. Third, our decision in Virginia v. Maryland, 540 U. S. 56 (2003), provides scant support for New Jersey’s claim. We there held that a Maryland-Virginia boundary settlement gave Virginia “sovereign authority, free from regulation by Maryland, to build improvements appurtenant to [Virginia’s] shore and to withdraw water from the [Potomac] River.” Id., at 75. Delaware’s 1905 agreement to New Jersey’s exercise of “riparian jurisdiction,” made when the boundary was still disputed, cannot plausibly be read as an equivalent recognition of New Jersey’s sovereign authority. Finally, Delaware’s claim to regulating authority is supported by New Jersey’s acceptance (until the present controversy) of Delaware’s jurisdiction over water and land within its domain to preserve the quality and prevent deterioration of the State’s coastal areas.
A
New Jersey hinges its case on Article VII of the 1905 Compact, which it reads as conferring on “each. State complete regulatory authority over the construction and operation of riparian improvements on its shores, even if the improvements extend past the low-water mark.” Exceptions by New Jersey to Report of Special Master and Supporting Brief 16 (hereinafter New Jersey Exceptions). New Jersey *610 v. Delaware II, New Jersey recognizes, confirmed Delaware’s sovereign ownership of the River and subaqueous soil within the twelve-mile circle. But, New Jersey emphasizes, the Court expressly made that determination “subject to the Compact of 1905.” 291 U. S., at 385. New Jersey acknowledges that Delaware “unquestionably can exercise its police power outshore of the low-water mark.” New Jersey Exceptions 16. New Jersey contends, however, that Delaware cannot do so in a manner that would interfere with the authority over riparian rights that Article VII of the 1905 Compact preserves for New Jersey. Ibid.
Because the meaning of the 1905 Compact and, in particular, Article VII, is key to the resolution of this controversy, we focus our attention on that issue. Significantly, Article VII provides that “[e]ach State may, on its own side of the river, continue to exercise” not “exclusive jurisdiction” or “jurisdiction” unmodified, but “riparian jurisdiction of every kind and nature.” 34 Stat. 860. New Jersey argues that “riparian jurisdiction” should be read broadly to encompass full police-power jurisdiction over activities carried out on riparian structures. New Jersey Exceptions 36-37. If New Jersey enjoys full police power over improvements extending from its shore, New Jersey reasons, then necessarily Delaware cannot encroach on that authority. See Report 54.
1
We agree with the Special Master that “ ‘riparian’ is a limiting modifier.” Report 57. Interpreting an interstate compact, “[j]ust as if [we] were addressing a federal statute,” New Jersey v. New York, 523 U. S. 767, 811 (1998), it would be appropriate to construe a compact term in accord with its common-law meaning, see Morissette v. United States, 342 U. S. 246, 263 (1952). The term “riparian jurisdiction,” however, was not a legal term of art in 1905, nor is it one now. See 7 Del. App. 4279, 4281 (Expert Report of Professor Jo *611 seph L. Sax (Nov. 7, 2006)). As the Special Master stated, “riparian jurisdiction” appears to be a verbal formulation “devised by the [1905 Compact] drafters specifically for Article VII.” Report 54.[13]
Elsewhere in the Compact, one finds the more familiar terms “jurisdiction” (in the introductory paragraphs and, most notably, in Article VIII) or “exclusive jurisdiction” (in Article IV).[14] To attribute to “riparian jurisdiction” the same meaning as “jurisdiction” unmodified, or to equate the novel term with the distinct formulation “exclusive jurisdiction,” would deny operative effect to each word in the Compact, contrary to basic principles of construction. See United States v. Menasche, 348 U. S. 528, 538-539 (1955).
In this regard, Article VIII bears reiteration:
“Nothing herein contained shall affect the territorial limits, rights, or jurisdiction of either State of, in, or over the Delaware River, or the ownership of the sub-aqueous soil thereof, except as herein expressly set forth.” 34 Stat. 860.
Presumably drafted in recognition of the still-unresolved boundary dispute, see supra, at 603-606, Article VIII requires an express statement in the Compact in order to “affect the territorial. . . jurisdiction of either State . . . over the Delaware River.” We resist reading the uncommon term “riparian jurisdiction,” even when aggrandized by the *612 phrase “of every kind and nature,” as tantamount to an express cession by Delaware of its entire “territorial . . . jurisdiction . . . over the Delaware River.”
2
Endeavoring to fathom the import of the novel term “riparian jurisdiction,” the Special Master recognized that a riparian landowner ordinarily enjoys the right to build a wharf to access navigable waters far enough to permit the loading and unloading of ships. Report 47-49, 58-59. Accord 1 H. Farnham, Law of Waters and Water Rights § 62, p. 279 (1904) (“The riparian owner is also entitled to have his contact with the water remain intact. This is what is known as the right of access, and includes the right to erect wharves to reach the navigable portion of the stream.”); id., § 111, p. 520 (“A wharf is a structure on the margin of navigable water, alongside of which vessels are brought for the sake of being conveniently loaded or unloaded.”). But the Special Master also recognized that the right of a riparian owner to wharf out is subject to state regulation. Report 58; see 1 Farnham, supra, § 63, p. 284 (rights of riparian owner “are always subordinate to the public rights, and the state may regulate their exercise in the interest of the public”); Shively v. Bowlby, 152 U. S. 1, 40 (1894) (“[A] riparian proprietor ... has the right of access to the navigable part of the stream in front of his land, and to construct a wharf or pier projecting into the stream..., subject to such general rules and regulations as the legislature may prescribe for the protection of the public ... .” (internal quotation marks omitted)).
New Jersey took no issue with the Special Master’s recognition that States, in the public interest, may place restrictions on a riparian proprietor’s activities. In its response to Delaware’s request for admissions, New Jersey readily acknowledged that a person wishing to conduct a particular activity on a wharf, in addition to obtaining a riparian grant, would have to comply with all other “applicable New Jersey *613 laws, and local laws.” 6 Del. App. 4147, 4156 (New Jersey’s Responses to Delaware’s First Request for Admissions ¶ 22 (Sept. 8, 2006)). See also Restatement (Second) of Torts § 856, Comment e, pp. 246-247 (1977) (“[A] state may exercise its police power by controlling the initiation and conduct of riparian and nonriparian uses of water.”). But New Jersey sees itself, to the exclusion of Delaware, as the State empowered to regulate, for the benefit of the public, New Jersey landowners’ exercise of riparian rights.
In the ordinary case, the State that grants riparian rights is also the State that has regulatory authority over the exercise of those rights. But cf. Cummings v. Chicago, 188 U. S. 410, 431 (1903) (federal regulation of wharfing out in the Calumet River did not divest local government of regulatory authority based on location of project within that government’s territory). In this regard, the negotiators of the 1905 Compact faced an unusual situation: As long as the boundary issue remained unsettled, they could not know which State was sovereign within the twelve-mile circle beyond New Jersey’s shore. They likely knew, however, that “[i]n a case of wharfing out . . . ‘[t]he rights of a riparian owner upon a navigable stream in this country are governed by the law of the State in which the stream is situated.’” 1 S. Wiel, Water Rights in the Western States § 898, p. 934 (3d ed. 1911) (quoting Weems Steamboat Co. of Baltimore v. People’s Steamboat Co., 214 U. S. 345, 355 (1909)). With the issue of sovereignty reserved by the 1905 Compact drafters for another day, the Special Master’s conclusion that Article VII’s reference to “riparian jurisdiction” did not mean “exclusive jurisdiction” is difficult to gainsay.
The Special Master pertinently observed that, as New Jersey read the 1905 Compact, Delaware had given up all governing authority over the disputed area while receiving nothing in return. He found New Jersey’s position “implausible.” Report 63. “Delaware,” the Special Master stated, “would not have willingly ceded all jurisdiction over matters *614 taking place on land that [Delaware adamantly] contended it owned exclusively and outright.” Id., at 64.[15]
New Jersey asserts that Delaware did just that, as shown by representations made during proceedings in New Jersey v. Delaware II. New Jersey Exceptions 44. Delaware’s reply brief before the Special Master in that case stated: “Article VII of the Compact is obviously merely a recognition of the rights of the riparian owners of New Jersey and a cession to the State of New Jersey by the State of Delaware of jurisdiction to regulate those rights.” 1 App. of New Jersey on Motion for Summary Judgment 123a. Further, at oral argument before the Special Master in that earlier fray, Delaware’s counsel said that, in his view, the 1905 Compact “ceded to the State of New Jersey all the right to control the erection of [wharves extending into the Delaware River from New Jersey’s shore] and to say who shall erect them.” Id., at 126a-l.
The Special Master in the instant case found New Jersey’s position dubious, as do we. The representations Delaware made in the course of New Jersey v. Delaware II, the Special Master here observed, were “fully consistent with [the Master’s] interpretation of Article VII [of the 1905 Compact].” Report 89. New Jersey did indeed preserve “the right to *615 exercise its own jurisdiction over riparian improvements appurtenant to its shore.” Ibid. But, critically, Delaware nowhere “suggested that New Jersey would have the exclusive authority to regulate all aspects of riparian improvements, even if on Delaware’s land.” Ibid.
Delaware, in its argument before the Special Master, was equally uncompromising. As a result of the 1934 boundary determination, Delaware urged, “the entire River is on Delaware’s ‘own side,’ and New Jersey consequently ha[d] no ‘side’ of the River on which to exercise any riparian rights or riparian jurisdiction.” Id., at 36. Article VII of the 1905 Compact, according to Delaware, was a “temporary” measure, “entirely... contingent on the ultimate resolution of the boundary.” Id., at 39. That reading, the Special Master demonstrated, was altogether fallacious. Id., at 36-40.
Seeking to harmonize Article VII with the boundary determination, the Special Master reached these conclusions. First, the 1905 Compact gave New Jersey no authority to grant lands owned by Delaware. Id., at 45-46. Second, Article VII’s preservation to each State of “riparian jurisdiction” means that New Jersey may control the riparian rights ordinarily and usually enjoyed by landowners on New Jersey’s shore. For example, New Jersey may define “how far a riparian owner can wharf out, the quantities of water that a riparian owner can draw from the River, and the like.” Id., at 57-58. Nevertheless, New Jersey’s regulatory authority is qualified once the boundary line at low water is passed. Id., at 58. Just as New Jersey cannot grant land belonging to Delaware, so New Jersey cannot authorize activities that go beyond the exercise of ordinary and usual riparian rights in the face of contrary regulation by Delaware.
B
Interstate compacts, like treaties, are presumed to be “the subject of careful consideration before they are entered into,
*616 and are drawn by persons competent to express their meaning and to choose apt words in which to embody the purposes of the high contracting parties.” Rocca v. Thompson, 223 U. S. 317, 332 (1912). Accordingly, the Special Master found informative a comparison of language in the 1905 Compact with language contained in an 1834 compact between New Jersey and New York. See Report 65. That compact established the two States’ common boundary along the Hudson River. Act of June 28, 1834, ch. 126, 4 Stat. 708. Similar to the boundary between New Jersey and Delaware settled in 1934 in New Jersey v. Delaware II, the 1834 accord located the New Jersey-New York boundary at “the low water-mark on the westerly or New Jersey side [of the Hudson River].” Art. Third, 4 Stat. 710; cf. supra, at 602. The 1834 agreement, however, expressly gave to New Jersey “the exclusive right of property in and to thé land under water lying west of the middle of the bay of New York, and west of the middle of that part of the Hudson river which lies between Manhattan island and New Jersey” and “the exclusive jurisdiction of and over the wharves, docks, and improvements, made and to be made on the shore of the said state...” Art. Third, ¶¶ 1, 2, 4 Stat. 710 (emphasis added).
“Comparable language [conferring exclusive authority],” the Special Master observed, “is noticeably absent in the [1905] Compact.” Report 66. The Master found this disparity “conspicuous,” id., at 68, for “[s]everal provisions in the two interstate compacts [contain] strikingly similar language,” id., at 66; see id., App. J (Table Comparing Similar Provisions in the New Jersey-New York Compact of 1834 and the New Jersey-Delaware Compact of 1905). Given that provisions of the 1905 Compact appear to have been adopted almost verbatim from New Jersey’s 1834 accord with New York, see ibid., New Jersey could hardly claim ignorance that Article VII could have been drafted to grant New Jersey “exclusive jurisdiction” (not merely “riparian jurisdiction”) *617 over wharves and other improvements extending from its shore into navigable Delaware River waters, id., at 67.[16]
C
New Jersey urged before the Special Master, and in its exceptions to his report, that Virginia v. Maryland, 540 U. S. 56, is dispositive of this case.[17] Both cases involved an interstate compact, which left the boundary between the contending States unresolved, and a later determination settling the boundary. And both original actions were referred to Ralph I. Lancaster, Jr., as Special Master. We find persuasive the Special Master’s reconciliation of his recommendations in the two actions. See Report 64-65, n. 118.
Virginia v. Maryland involved a 1785 compact and an 1877 arbitration award. Agreeing with the Special Master, we held that the arbitration award permitted Virginia to construct a water intake structure extending into the Potomac River, even though the award placed Virginia’s boundary at the low-water mark on its own side of the Potomac. See 540 U. S., at 75. “Superficially,” the Special Master said, “that holding would appear to support New Jersey’s argument here, i. e., that construction of wharves off New Jersey’s shore should not be subject to regulation by Delaware.” Report 64, n. 118. But, the Special Master explained, the result in Virginia v. Maryland turned on “the unique language of the compact and arbitration award involved in that case.” Report 64, n. 118.
*618 The key provision of the 1785 compact between Maryland and Virginia, we observed, addressed only “the right [of the citizens of each State] to build wharves and improvements regardless of which State ultimately was determined to be sovereign over the River.” 540 U. S., at 69. Concerning the rights of the States, the 1877 arbitration award, not the 1785 compact, was definitive. See id., at 75. The key provision of that award recognized the right of Virginia, “qua sovereign,” “to use the River beyond low-water mark,” a right “nowhere made subject to Maryland’s regulatory authority.” Id., at 72.
Confirming the “sovereign character” of Virginia’s right, we noted, Maryland had proposed to the arbitrators that the boundary line between the States be drawn around “all wharves and other improvements now extending or which may hereafter be extended, by authority of Virginia from the Virginia shore into the [Potomac] beyond low water mark.” Id., at 72, n. 7 (internal quotation marks omitted). Although the formulation Maryland proposed was not used in the arbitration award, the arbitrators plainly manifested their intention to accomplish the same end: to safeguard “Virginia’s authority to construct riparian improvements outshore of the low water mark without regulation by Maryland.” Report 65, n. 118; see Virginia v. Maryland, 540 U. S., at 73, n. 7. By contrast, in the instant case, neither the 1905 Compact, nor New Jersey v. Delaware II, the 1934 decision settling the boundary dispute, purported to give New Jersey “all regulatory oversight (as opposed to merely riparian oversight)” or to endow New Jersey with authority “exclusive of jurisdiction by Delaware.” Report 65, n. 118; see supra, at 610-615.
D
We turn, finally, to the parties’ prior course of conduct, on which the Special Master placed considerable weight. See Report 68-84; cf. O’Connor v. United States, 479 U. S. 27, 33 *619 (1986) (“The course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning.”).
Until the 1960’s, wharfing out from the New Jersey shore into Delaware territory was not a matter of controversy between the two States. From 1851, when New Jersey began issuing grants for such activity, through 1969, only 11 constructions straddled the interstate boundary. Report 74. At the time of the 1905 Compact and continuing into the 1950’s, Delaware, unlike New Jersey, issued no grants or leases for its subaqueous lands. Delaware regulated riparian improvements solely under its common law, which limited developments only to the extent they constituted public nuisances. Id., at 69.
In 1961, Delaware enacted its first statute regulating submerged lands, and in 1966, it enacted broader legislation governing leases of state-owned subaqueous lands. Id., at 70. The State grandfathered piers and wharves built prior to the effective date of the regulations implementing the 1966 statute. Id., at 70-71. Permits were required, however, for modifications to the grandfathered structures and for new structures. Id., at 71.[18]
Then, in 1971, Delaware enacted the DCZA to prevent “a significant danger of pollution to the coastal zone.” Del. Code Ann., Tit. 7, §7001. The DCZA prohibits within the coastal zone “[h]eavy industry uses of any kind” and “offshore gas, liquid or solid bulk product transfer facilities.” §7003. In 1972, Delaware rejected as a prohibited bulk transfer facility El Paso Eastern Company’s request to build an LNG unloading facility extending from New Jersey into *620 Delaware. 5 Del. App. 3483 (Letter from David Keifer, Director of Delaware State Planning Office, to Barry Hunt-singer, El Paso Eastern Company (Feb. 23, 1972)). Shortly before denying El Paso’s application, Delaware notified New Jersey’s Department of Environmental Protection (NJDEP), which raised no objection to Delaware’s refusal to permit the LNG terminal.[19] Delaware similarly relied on the DCZA to deny permits for construction of the Crown Landing unloading facility at issue in this case. Report 20.
Also in 1972, Congress enacted the federal Coastal Zone Management Act, 86 Stat. 1280, 16 U. S. C. § 1451 et seq., which required States to submit their coastal management programs to the Secretary of Commerce for review and approval. In return, States with approved programs would receive federal funding for coastal management. See §§ 1454-1455. Delaware’s coastal management program, approved by the Secretary in 1979, specifically addressed LNG facilities and reported that “ ‘no site in Delaware [is] suitable for the location of any LNG import-export facility.’” Report 72 (quoting 4 Del. App. 2591 (Dept. of Commerce, National Oceanic and Atmospheric Admin. (NOAA), Delaware Coastal Management Program and Final Environmental Impact Statement 57 (Mar. 1980))). The next year, 1980, New Jersey gained approval for its coastal management program. The Special Master found telling, as do we, a representation New Jersey made in its submission to the Secretary:
“The New Jersey and Delaware Coastal Management agencies ... have concluded that any New Jersey project extending beyond mean low water must obtain coastal permits from both states. New Jersey and Delaware, therefore, will coordinate reviews of any proposed devel *621 opment that would span the interstate boundary to ensure that no development is constructed unless it would be consistent with both state coastal management programs.” Report 81 (quoting 4 Del. App. 2657 (NOAA, N. J. Coastal Management Program and Final Environmental Impact Statement 20 (Aug. 1980)); emphasis added).
See also Report 72-73. That representation, the Special Master observed, “is fundamentally inconsistent with the position advanced by New Jersey here, i. e., that only New Jersey has the right to regulate such projects.” Id., at 73.
As the Special Master reported, just three structures extending from New Jersey into Delaware were built between 1969 and 2006. Delaware’s DNREC issued permits for each of them. Id., at 74-76. One of those projects was undertaken by New Jersey itself. The State, in 1996, sought to refurbish a stone pier at New Jersey’s Fort Mott State Park. Id., at 75-76. New Jersey issued a waterfront development permit for the project, but that permit approved structures only to the low-water mark. Delaware’s approval was sought and obtained for structures outshore of that point. Even during the pendency of this action, New Jersey applied to Delaware for renewal of the permit covering the portion of the Fort Mott project extending into Delaware. Ibid.[20]
*622 IV New Jersey v. Delaware II upheld Delaware’s ownership of the River and subaqueous soil within the twelve-mile circle. The 1905 Compact did not ordain that this Court’s 1934 settlement of the boundary would be an academic exercise with slim practical significance. Tending against a reading that would give New Jersey exclusive authority, Article VIII of the Compact, as earlier emphasized, see supra, at 611, states: “Nothing herein contained shall affect the territorial limits, rights or jurisdiction of either State of, in or over the Delaware River, or the ownership of the subaqueous soil thereof, except as herein expressly set forth.” Nowhere does Article VII “expressly set forth” Delaware’s lack of any governing authority over territory within the State’s own borders. Cf. Report 43-46.
The Special Master correctly determined that Delaware’s once “hands off” policy regarding coastal development did not signal that the State never could or never would assert any regulatory authority over structures using its subaqueous land. Id., at 69-70. In the decades since Delaware began to manage its waters and submerged lands to prevent “a significant danger of pollution to the coastal zone,” Del. Code Ann., Tit. 7, § 7001, the State has followed a consistent course: Largely with New Jersey’s cooperation, Delaware has checked proposed structures and activity extending beyond New Jersey’s shore into Delaware’s domain in order to “protect the natural environment of [Delaware’s] . .. coastal areas.” Ibid.
Given the authority over riparian rights that the 1905 Compact preserves for New Jersey, Delaware may not impede ordinary and usual exercises of the right of riparian owners to wharf out from New Jersey’s shore. The Crown Landing project, however, goes well beyond the ordinary or usual. See supra, at 606-607. Delaware’s classification of the proposed LNG unloading terminal as a “[h]eavy industry *623 use” and a “bulk product transfer facilit[y],” Del. Code Ann., Tit. 7, §§ 7001, 7003, has not been, and hardly could be, challenged as inaccurate.[21] Consistent with the scope of its retained police power to regulate certain riparian uses, it was within Delaware’s authority to prohibit construction of the facility within its domain.[22] As recommended by the Special Master, we confirm Delaware’s authority to deny permission for the Crown Landing terminal, overrule New Jersey’s exceptions, and enter, with modifications consistent with this opinion, the decree proposed by the Special Master.

It is so ordered.

Justice Breyer took no part in the consideration or decision of this case.
DECREE
The Court having exercised original jurisdiction over this controversy between two sovereign States; the issues having been referred to the Special Master appointed by the Court; the Court having received briefs and heard oral argument on New Jersey’s exceptions to the Report of the Special Master and Delaware’s responses thereto; and the Court having issued its Opinion, swpra, at 601-622 and this page.
It is Hereby Ordered, Adjudged, Declared, and Decreed as follows:
1. (a) The State of New Jersey may, under its laws, grant and thereafter exercise governing authority over ordinary *624 and usual riparian rights for the construction, maintenance, and use of wharves and other riparian improvements appurtenant to the eastern shore of the Delaware River within the twelve-mile circle and extending outshore of the low-water mark; and further
(b) The State of Delaware may, under its laws and subject to New Jersey’s authority over riparian rights as stated in the preceding paragraph, exercise governing authority over the construction, maintenance, and use of those same wharves and other improvements appurtenant to the eastern shore of the Delaware River within the twelve-mile circle and extending outshore of the low-water mark, to the extent that they exceed ordinary and usual riparian uses.
(c) In refusing to permit construction of the proposed Crown Landing LNG unloading terminal, Delaware acted within the scope of its governing authority to prohibit unreasonable uses of the river and soil within the twelve-mile circle.
2. Except as hereinbefore provided, the motions for summary judgment of both the States of New Jersey and Delaware are denied and their prayers for relief dismissed with prejudice.
3. The party States shall share equally in the compensation of the Special Master and his assistants, and in the costs of this litigation incurred by the Special Master.
4. The Court retains jurisdiction to entertain such further proceedings, enter such orders, and issue such writs as it may from time to time deem necessary or desirable to give proper force and effect to this Decree or to effectuate the rights of the parties.

 A map showing the interstate boundary line is annexed to the Court’s Decree. New Jersey v. Delaware II, 295 U. S. 694, 700 (1935). Six of New Jersey’s municipalities have one boundary all or partially at the low-water mark of the Delaware River within the twelve-mile circle.

 All Members of the Court agree that New Jersey lacks exclusive jurisdiction over riparian structures. Post, at 633 (Scalia, J., dissenting); post, at 626 (Stevens, J., concurring in part and dissenting in part).

 The “low-water mark” of a river is “the point to which the water recedes at its lowest stage.” Black’s Law Dictionary 1623 (8th ed. 2004).

 The Report of the Special Master, and all public filings in this case, are available at http://www.piereeatwood.com/custompagedisplay.asp?Show=2.

 After the States approved the Compact, but prior to Congress’ ratification, the parties submitted a joint application for suspension of Court proceedings pending action by the National Legislature. New Jersey v. Delaware I, O. T. 1905, No. 1, Orig., Statement of reasons submitted orally for the joint application of Counsel on both sides for suspension of proceedings until the further order of the Court (reproduced in 1 App. of Delaware on Cross-Motions for Summary Judgment 190 (hereinafter Del. App.)). In that submission, Delaware’s counsel represented that “[t]he compact... was . . . not a settlement of the disputed boundary, but a truce or modus vivendi.” Ibid. Counsel further stated that the “main purpose” of the Compact was to authorize joint regulation of “the business of fishing in the Delaware River and Bay.” Ibid.

 The dissent suggests, post, at 630, that the long dormant first original action “appeared to he going badly” for Delaware. The strength of Delaware’s claim to sovereign ownership of the riverbed within the twelve-mile circle, however, is comprehensively described in New Jersey v. Delaware II, 291 U. S., at 364-378.

 Two or three LNG supertankers, it was anticipated, would arrive at the unloading terminal each week. 7 Del. App. 4303, 4307 (Affidavit of Philip Cherry, Delaware Dept, of Natural Resources and Environmental Control, Director of Policy and Planning) (hereinafter Cherry Affidavit). In transit, the ships would pass densely populated areas, id., at 4307-4308; a moving safety zone would restrict other vessels 3,000 feet ahead and behind, and 1,500 feet on all sides of a supertanker, id., at 4308.

 The dissent points to other projects involving extensive dredging. Post, at 642. The examples presented, however, involved large-scale public works, not privately owned and operated facilities.

 Three months after seeking Delaware’s permission, BP commenced the permitting process in New Jersey, by filing a Waterfront Development Application with New Jersey’s Department of Environmental Protection. Report 20.

 The DCZA is designed “to control the location, extent and type of industrial development in Delaware’s coastal areas . . . and [to] safeguard th[e] use [of those areas] primarily for recreation and tourism.” Del. Code Ann., Tit. 7, §7001 (2001).

 On BP’s appeal, Delaware’s Coastal Zone Industrial Control Board affirmed DNREC’s determination that the Crown Landing project was a bulk product transfer facility prohibited by the DCZA. BP did not appeal the decision, rendering it a final determination. Report 20-21. The dissent suspects that Delaware’s permit denial may have been designed to lure BP away from New Jersey, siting the plant, instead, on Delaware’s “own shore.” Post, at 645. Delaware law, however, proscribes “[h]eavy industry us[e],” Del. Code Ann., Tit. 7, § 7003, in any area within “[t]he coastal zone” over which Delaware is sovereign, § 7002(a). Nothing whatever in the record before us warrants the suggestion that Delaware acted duplieitously.

 New Jersey takes no exception to the Special Master’s determinations that Delaware was not judicially estopped from challenging New Jersey’s interpretation of Article VII, Report 86-92, and that Delaware has not lost jurisdiction through prescription and acquiescence, id., at 92-99. See Exceptions by New Jersey to Report of Special Master and Supporting Brief 16, n. 5 (hereinafter New Jersey Exceptions).

 The term appears in no other interstate compact. New Jersey’s codification of the 1905 Compact, N. J. Stat. Ann. § 52:28-41 (West 2001), includes the term, but our attention has been called to no other state statute that does so.

 The last paragraph of Article IV reads: “Each State shall have and exercise exclusive jurisdiction within said river to arrest, try, and punish its own inhabitants for violation of the concurrent legislation related to fishery herein provided for.” 34 Stat. 860 (emphasis added). See also id., at 859 (Articles I and II, recognizing the “exclusive jurisdiction” of each State in regard to service of criminal process).

 The dissent insists that Delaware received “plenty in return.” Post, at 630. But, in truth, the 1905 Compact gave neither State “plenty.” Each State accommodated to the other to assure equal access to fishing rights in the River. See supra, at 604, n. 5. Delaware agreed to the Compact “not [as] a settlement of the disputed boundary, but [as] a truce or modus vivendi.” 1 Del. App. 190. In deciding whether to proceed with the litigation, Delaware’s Attorney General advised that the suit “would entail very considerable expense.” 2 id., at 1069, 1075 (Letter from Herbert Ward to Gov. John Hunn (Jan. 31, 1903)). He noted, however, that the process of preparing Delaware’s Answer had “greatly strengthened the belief and reliance of counsel... upon the justice of her claim.” Id., at 1076. The decision in New Jersey v. Delaware II confirmed Delaware’s conviction. See supra, at 605, n. 6.

 The 1834 accord was the subject of significant litigation in the years leading up to and surrounding the adoption of the 1905 Compact. Report 67. Notably, New York’s highest court concluded Article Third of the 1834 interstate agreement meant what it said: New Jersey had “exclusive” jurisdiction over wharves extending from and beyond its shore; therefore New York lacked authority to declare those wharves to be nuisances. See New York v. Central R. Co. of N. J., 42 N. Y. 283, 293 (1870); Report 67.

 The dissent, post, at 638-640, essentially repeats New Jersey’s argument.

 In 1986, Delaware adopted its current Subaqueous Lands Act, 65 Del. Laws eh. 508, Del. Code Ann., Tit. 7, eh. 72 (2001), which authorizes DNREC to regulate any potentially polluting use made of Delaware’s sub-aqueous lands and to grant or lease property interests in those lands. See id., § 7206(a).

 5 Del. App. 3481 (Letter from David Keifer, Director of Delaware State Planning Office, to Richard Sullivan, Commissioner, NJDEP (Feb. 17, 1972)); id., at 3485 (Letter from Mr. Sullivan, NJDEP, to Mr. Keifer (Mar. 2, 1972)).

 New Jersey asserts “the most striking thing about this [course of conduct] evidence is the lack of any reference by . .. New Jersey officials to the [1905] Compact itself, much less to the terms of Article VII.” New Jersey Exceptions 48. “All citizens,” however, “are presumptively charged with knowledge of the law.” Atkins v. Parker, 472 U. S. 115, 130 (1985). The 1905 Compact is codified at N. J. Stat. Ann. §§52:28-34 to 52:28-45. We find unconvincing New Jersey’s contention that its officials were ignorant of the State’s own statutes. The assertion is all the more implausible given New Jersey’s recognition of Delaware’s regulatory authority in New Jersey’s coastal management plan, despite a New Jersey county planning board’s objection to that acknowledgment. Report 82; 4 Del. App. 3135 (NOAA, N. J. Coastal Management Program and Final Environmental Impact Statement 499 (Aug. 1980)).

 We agree with the dissent, post, at 644, that Delaware could not rationally categorize as a “heavy industry use” a terminal for unloading cargoes of tofu and bean sprouts. On the other hand, we cannot fathom why, if Delaware could block a casino, or even a restaurant on a pier extending into its territory, post, at 633-634, it could not reject a permit for the LNG terminal described, supra, at 606-607.

 In deploring New Jersey’s loss, post, at 644-645, the dissent overlooks alternative sites in New Jersey that could accommodate BP’s LNG project. 7 Del. App. 4306 (Cherry Affidavit).