Justice Scalia,
with whom Justice Alito joins, dissenting.
With all due respect, I find the Court’s opinion difficult to accept. The New Jersey-Delaware Compact of 1905 (Compact or 1905 Compact), Art. VII, 34 Stat. 860, addressed the “exercise [of] riparian jurisdiction,” and the power to “make grants ... of riparian . . . rights.” The particular riparian right at issue here is the right of wharfing out. All are agreed that jurisdiction and power over that right were given to New Jersey on its side of the Delaware River. The Court says, however, that that jurisdiction and power was not exclusive. I find that difficult to accept, because if Delaware could forbid the wharfing out that Article VII allowed New Jersey to permit, Article VII was a ridiculous nullity. That could not be what was meant. The Court seeks to avoid that obstacle to credibility by saying that Delaware’s jurisdiction and power is limited to forbidding “activities that go beyond the exercise of ordinary and usual riparian rights.” Ante, at 615. It is only “riparian structures and operations of extraordinary character” over which Delaware retains “overlapping authority to regulate.” Ante, at 603 (emphasis added). But that also is difficult to accept, because the Court explains neither the meaning nor the provenance of its “extraordinary character” test. The exception (whatever it means) has absolutely no basis in prior law, which regards as beyond the “ordinary and usual” (and hence beyond the legitimate) only that wharfing out which interferes with navigation. So unheard of is the exception that its first appearance in this case is in the Court’s opinion.
I would sustain New Jersey’s objections to the Special Master’s Report.
*629 I
I must begin by clearing some underbrush. One of Delaware’s principal arguments — an argument accepted by the Master and implicitly accepted by the Court — is that the 1905 Compact must not be construed to limit Delaware’s pre-Compact (albeit at the time unrecognized) sovereign control over the Delaware River, because of the “strong presumption against defeat of a State’s title” in interpreting agreements. See Report of Special Master 42-43 (Report) (quoting United States v. Alaska, 521 U. S. 1, 34 (1997); internal quotation marks omitted). According to Delaware, this presumption establishes that the 1905 Compact gave New Jersey the authority to allocate riparian rights, but left with Delaware the power to veto exercises of those rights under its general police-power authority.
I have written of this presumption elsewhere that it “has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation. It is simply a rule of presumed (or implied-in-fact) intent.” United States v. Winstar Corp., 518 U. S. 839, 920 (1996) (opinion concurring in judgment). It is a manifestation of the commonsense intuition that a State will rarely contract away its sovereign power. That intuition is sound enough in almost all state dealings with private citizens, and in some state dealings with other States. It has no application here, however, because the whole purpose of the 1905 Compact was precisely to come to a compromise agreement on the exercise of the two States’ sovereign powers. Entered into at a time when Delaware and New Jersey disputed the location of their boundary, the Compact demarcated the authority between the two States with respect to service of civil and criminal process on vessels, rights of fishery, and riparian rights on either side of the Delaware River within the circle of a 12-mile radius centered on the town of New Castle, Delaware. See Compact, 34 Stat. 858; New Jersey v. Delaware, 291 U. S. 361, 377-378 (1934) (New Jersey v. Delaware II). There is no way the Compact can be interpreted other *630 than as a yielding by both States of what they claimed to be their sovereign powers. The only issue is what sovereign powers were yielded, and that is best determined from the language of the Compact, with no thumb on the scales.
Besides relying on the presumption, the Special Master believed (and the Court believes) that New Jersey’s claims must be viewed askance because it is implausible that Delaware would have “given up all governing authority over the disputed area while receiving nothing in return.” Ante, at 613. But Delaware received plenty in return. First of all, it ensured access of its citizens to fisheries on the side of the river claimed by New Jersey — something it evidently cared more about than the power to control wharfing out from the Jersey shore, which it had never theretofore exercised. And it obtained (as the Compact observed) “the amicable termination” of New Jersey’s then-pending original action in the Supreme Court, which had “been pending for twenty-seven years and upwards.” 34 Stat. 858-859. How plausible it was that Delaware would give up anything to get rid of that suit surely depends upon how confident Delaware was that it would prevail. And to tell the truth, the case appeared to be going badly. As the Compact observed, the Supreme Court had issued a preliminary injunction against Delaware “restraining the execution of certain statutes of the State of Delaware relating to fisheries.” Id., at 859. The order issuing that injunction had remarked that Delaware had now “interfered with and claimed to control the right of fishing” which New Jerseyans had “heretofore been accustomed” to exercise without Delaware’s interference for over 70 years. Order in New Jersey v. Delaware, No. 1, Orig. (filed 1877), Lodging for Brief of State of Delaware in Opposition to State of New Jersey’s Motion to Reopen (Tab 1, pp. 52-54). By providing for dismissal of New Jersey’s suit, the Compact assured Delaware that the Supreme Court’s rather ominous sounding preliminary order would not become the Court’s *631 holding, perhaps the consequence of a rationale that gave New Jersey jurisdiction in the river.
II
Article VII of the 1905 Compact between New Jersey and Delaware reads as follows:
“Each State may, on its own side of the river, continue to exercise riparian jurisdiction of every kind and nature, and to make grants, leases, and conveyances of riparian lands and rights under the laws of the respective States.” 34 Stat. 860.
As the Court recognizes, this provision allocates to each State jurisdiction over a bundle of rights that, at the time of the Compact, riparian landowners, or “owners of land abutting on bodies of water,” possessed under the common law “by reason of their adjacency.” 1 H. Farnham, Law of Waters and Water Rights § 62, p. 278 (1904) (Farnham). Those riparian rights included the right to “fill in and to build wharves and other structures in the shallow water in front of [the upland] and below low-water mark.” Id., § 113b, at 534. A wharf, the type of structure at issue here, “imports a place built or constructed for the purpose of loading or unloading goods.” Id., § 111, at 520, n. 1. It was considered “a necessary incident of the right to construct [wharves and piers] that they shall project to a distance from the shore necessary to reach water which shall float vessels, the largest as well as the smallest, that are engaged in commerce upon the water into which they project.” Id., at 522. Thus, wharves could be built up to “the point of navigability,” J. Gould, Treatise on the Law of Waters, including Riparian Rights § 181, p. 352 (2d ed. 1891) (Gould), so long as they did not “interfere needlessly with the right of navigation” possessed by members of the general public upon navigable waters, 1 Farnham § 111, at 521.
The two States would have been acquainted with this common law. New Jersey case law comported with the horn- *632 book rules. According to the State’s Court of Errors and Appeals, it was “undoubted” and the “common understanding” that “the owners of land bounding on navigable waters had an absolute right to wharf out and otherwise reclaim the land down to and even below low water, provided that they did not thereby impede the paramount right of navigation.” Bell v. Gough, 23 N. J. L. 624, 658 (1852) (opinion of Elmer, J.); see also J. Angelí, Treatise on the Right of Property in Tide Waters and in the Soil and Shores Thereof 234 (1847) (“[T]he right of a riparian proprietor to ‘wharf out’ into a public river, is a local custom in New Jersey”); Gould § 171, at 342 (“[T]he common understanding in [New Jersey] carries the right [to wharf out] even below low-water mark, provided there is no obstruction to the navigation”). Case authority in Delaware seems to be lacking, but in New Jersey v. Delaware II the State assured the Special Master at oral argument that “it is undoubtedly true in the State of Delaware . . . that the upland owner had the right to wharf out. . . subject only that you must not. . . obstruct navigation.” 1 App. of New Jersey on Motion for Summary Judgment 126a-l (hereinafter NJ App.).
Thus, under the plain terms of the 1905 Compact, each State had “jurisdiction” — the “authority of a sovereign power to govern or legislate,” Webster's International Dictionary of the English Language 806 (1898) — over wharfing out on “its own side of the river.” To emphasize that this jurisdiction was plenary — that it included, for example, not merely the power to prohibit wharfing out but also the power to permit it — Article VII specified that the jurisdiction it conferred would be “of every kind and nature.”
And finally, the jurisdictional grant was not framed as though it was conferring on either State some hitherto unexercised power. Rather, the Compact provided that each State would “continue to” exercise the allocated “riparian jurisdiction,” clearly envisioning that each State would wield in the future the same authority over riparian rights it had *633 wielded in the past. 34 Stat. 860 (emphasis added). This is significant because, before adoption of the Compact in 1905, New Jersey alone had regulated the construction of riparian improvements on New Jersey’s side of the Delaware River. It had repeatedly authorized the construction of piers and wharves that extended beyond the low-water line. App. to Report C-4 to C-5 (listing New Jersey Acts authorizing riparian landowners to construct wharves); 7 NJ App. 1196a-1199a. Delaware, by contrast, had never regulated riparian rights on the New Jersey side, and indeed, at the time of the Compact even on its own side there was “little evidence of [the State’s] active involvement in shoreland development . . ..” Report 69.
I would think all of this quite conclusive of the fact that New Jersey was given full and exclusive control over riparian rights on the New Jersey side. The Court concludes that this was not so, however, in part because of the alleged implausibility of Delaware’s “giv[ing] up all governing authority ... while receiving nothing in return,” ante, at 613 (a mistaken contention that I have already addressed), and in part because “riparian jurisdiction” is different from “exclusive jurisdiction,” the term used in an 1834 Compact between New Jersey and New York, which referred to “the exclusive jurisdiction of and over the wharves, docks, and improvements, made and to be made on the shore...” Act of June 28, 1834, ch. 126, Art. Third, 4 Stat. 710.
I willingly concede that exclusive riparian jurisdiction is not the same as “exclusive jurisdiction” simpliciter. It includes only exclusive jurisdiction over riparian rights which, as I have described, include the right to erect wharves for the loading and unloading of goods. That jurisdiction does not necessarily include, for example, the power to permit or forbid the construction of a casino on the wharf, or even the power to serve legal process on the wharf. Jurisdiction to control such matters — which were not established as part of riparian rights by the common-law and *634 hornbook sources that the parties relied on in framing the Compact — may well fall outside the scope of the “riparian jurisdiction” that the Compact grants. See, e. g., Tewksbury v. Deerfield Beach, 763 So. 2d 1071 (Fla. App. 1999) (operation of a restaurant on a dock is not included within riparian rights). Such powers — which may well have been conveyed by a grant of “exclusive jurisdiction” such as that contained in the New York-New Jersey Compact — are not at issue in this case. What is at issue is jurisdiction over the core riparian right of building a wharf to be used for the loading and unloading of cargo. And that that jurisdiction was given exclusively to New Jersey is made perfectly clear by the Compact’s recognition of each State’s riparian jurisdiction only “on its own side of the river.” 34 Stat. 860 (emphasis added). It does not take vast experience in textual interpretation to conclude that this implicitly excludes each State’s riparian jurisdiction on the other State’s side of the river. (Inclusio unius est exclusio alterius.) There was no need, therefore, to specify exclusive riparian jurisdiction.
The Court’s position gains no support from the fact that the rights of a private riparian owner “ ‘are always subordinate to the public rights, and the state may regulate their exercise in the interest of the public.’ ” Ante, at 612 (quoting 1 Farnham § 63, at 284). The Compact did not purport to convey mere private rights, but rather “riparian jurisdiction of every kind and nature.” If that means anything at all, it means that New Jersey is the State that “may regulate [the] exercise [of the rights of a private riparian owner] in the interest of the public.” Delaware’s contention that it retains the authority to prohibit under its police power even those activities that are specifically allowed to New Jersey under the Compact renders not just Article VII but most of the Compact a virtual nullity. Article III, for example, gives the-States “common right of fishery throughout, in, and over the waters” of the Delaware. 34 Stat. 859. But under its police powers a sovereign State could regulate fishing *635 within its public navigable waters. See Gould § 189, at 362. Thus, under Delaware’s view, just as its ownership of the riverbed would allow it to trump New Jersey’s authority to permit wharfing out, so also its ownership of the riverbed would allow it to prevent fishing. That would be an extraordinary result, since the litigation the 1905 Compact was designed to resolve arose over fishing rights, after Delaware enacted a law in 1871 requiring New Jersey fishermen to obtain a Delaware license. See Report 3-6.
Ill
The Court, following the Special Master’s analysis, see id., at 68-84, asserts that today’s judgment is supported by the parties’ course of conduct after conclusion of the Compact. I frankly think post-Compact conduct irrelevant to this case, since it can properly be used only to clarify an ambiguous agreement, and there is no ambiguity here. The Court, moreover, overstates the post-Compact conduct favoring Delaware’s position and understates the post-Compact conduct favoring New Jersey. But even if post-Compact conduct is consulted, no such conduct — none whatever — supports the Court’s “extraordinary character” test, whereas several instances of such conduct strongly support the resolution I have suggested in this dissent.
The Court relies upon four instances of Delaware’s exercise of jurisdiction over wharfing out from the Jersey shore, and two instances of New Jersey’s acquiescence in such an exercise — all postdating 1969. As to the former, the three structures extending from New Jersey into Delaware built between 1969 and 2006 were permitted by Delaware, ante, at 621; and another application for a permit was denied, ante, at 619-620. The Court never establishes, however, that these instances of Delaware’s assertion of jurisdiction related to wharves of “extraordinary character,” which is the only jurisdiction that the Court’s decree confers upon Delaware. At best, these assertions of jurisdiction support not the *636 Court’s opinion, but rather Delaware’s assertion that it may regulate all wharves on the river — an assertion that the Court rejects. The same mismatch is present with both instances of New Jersey’s asserted acquiescence. One of them was New Jersey’s application for Delaware’s permission to refurbish the stone pier at Fort Mott State Park, described ante, at 621. That construction could not conceivably be characterized as of “extraordinary character,” and thus New Jersey did not need to ask Delaware for permission under the Court’s theory. In the other instance, described ante, at 620, New Jersey’s Coastal Management Agency assured the Secretary of Commerce that “ ‘any New Jersey project extending beyond mean low water’ ” (emphasis added) had to be approved by Delaware’s Coastal Management Agency as well as New Jersey’s. This again supports Delaware’s theory of this case, but not the Court’s.*
While post-Compact conduct provides no — absolutely zero — support for the Court’s interpretation, it provides substantial support for the one I have suggested. In New Jersey v. Delaware II, a case before this Court involving precisely the meaning of the Compact, the attorney general of *637 Delaware (obviously authorized to present the State’s position on the point) conceded to the Special Master that “Article VII of the Compact is obviously merely a recognition of the rights of the riparian owners of New Jersey and a cession to the State of New Jersey by the State of Delaware of jurisdiction to regulate those rights.” 1 NJ App. 123a (emphasis added). And at oral argument before the Special Master, Delaware’s special counsel — Clarence A. Southerland, a former state attorney general and future Chief Justice of the Supreme Court of Delaware, see Delaware Bar in the Twentieth Century 375 (H. Winslow, A. Bookout, & P. Hannigan eds. 1994) — explained that “the Compact of 1905 expressly acknowledged the rights of the citizens of New Jersey, at least, by implication to wharf out” and that New Jersey possessed “all the right to control the erection of those wharves and to say who shall erect them.” 1 NJ App. 126a-l (emphasis added). And in its Supreme Court brief in that litigation, Delaware assured the Court, without conditions, that “Delaware has never questioned the right of citizens of New Jersey to wharf out to navigable water nor can such a right be questioned now because it is clearly protected by the Compact of 1905 between the States.” Id., at 139a (emphasis added). Delaware’s Supreme Court brief rejected New Jersey’s argument that, if the Court found the boundary line to be the low-water mark on the New Jersey shore, “the interests of the riparian owners will be either destroyed or seriously prejudiced.” Id., at 140a. That concern, Delaware said, was misguided because the 1905 Compact “recognized the rights of riparian owners in the river to wharf out.” Ibid. “The effect of Article VII of the Compact,” the brief explained, “was that the State of Delaware recognized the rights of the inhabitants on the east side of the river to wharf out to navigable water. This right had never been questioned and was undoubtedly inserted to put beyond question the riparian rights (as distinguished from title) of land owners in New Jersey.” Id., at 141a. These concessions are *638 powerful indication that Delaware’s understanding of the Compact was the same as the one I assert.
IV
Our opinion in Virginia v. Maryland, 540 U. S. 56 (2003), effectively decided this case. It rejected the very same assertion of a riverbed-owning State’s supervening police-power authority over constructions into the river from a State that had been conceded riparian rights. That case involved two governing documents rather than (as here) only one. The first, a 1785 compact, provided:
“ ‘The citizens of each state respectively shall have full property in the shores of Potowmack river adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river.’” Id., at 62.
The second, an arbitration award of 1877 that interpreted the earlier compact, read as follows:
“ ‘Virginia is entitled not only to full dominion over the soil to low-water mark on the south shore of the Potomac, but has a right to such use of the river beyond the line of low-water mark as may be necessary to the full enjoyment of her riparian ownership, without impeding the navigation or otherwise interfering with the proper use of it by Maryland, agreeably to the compact of seventeen hundred and eighty-five.’” Id., at 62-63.
We rejected Maryland’s police-power authority to forbid Virginia’s construction of a water intake structure that extended into Maryland territory, and -held that “Virginia’s right ‘to erect . . . structures connected with the shore’ is inseparable from, and ‘necessary to,’ the ‘full enjoyment of her riparian ownership’ of the soil to low-water mark.” Id., *639 at 72. Maryland, we observed, was “doubtless correct that if her sovereignty over the River was well settled as of 1785, we would apply a strong presumption against reading the Compact as stripping her authority to regulate activities on the River.” Id., at 67. But because the “scope of Maryland’s sovereignty over the River was in dispute both before and after the 1785 Compact,” no such presumption existed. Id., at 68.
Today’s opinion, quoting the Special Master, claims that the result in Virginia v. Maryland turned on “ ‘the unique language of the compact and arbitration award involved in that case.’” Ante, at 617 (quoting Report 64, n. 118). But the case did not say that. And of course virtually every written agreement or award has “unique language,” so if we could only extend to other cases legal principles pertaining to identical language our interpretive jurisprudence would be limited indeed. The documents in Virginia v. Maryland said in other words precisely what the Compact here said: that one of the States (there, Virginia, here, New Jersey) was given riparian rights, including the right to construct wharves and improvements. And the holding of the case was that those rights could be exercised free of police power or other interference by the State owning the riverbed.
The Court contends that in Virginia v. Maryland the arbitration award, rather than the compact, “was definitive,” because it recognized the right of Virginia “ ‘qua sovereign,’ ” and nowhere made the right “ ‘subject to Maryland’s regulatory authority.’” Ante, at 618 (quoting 540 U. S., at 72). But Article VII of the Compact here at issue likewise spoke of the rights of New Jersey “qua sovereign” (what else does the “exercise [of] riparian jurisdiction” mean?) and similarly did not make those rights subject to Delaware’s regulatory authority. We stressed in Virginia v. Maryland that the salient factor in the interpretation of the compact (and hence in the arbitration award’s interpretation of the compact) was that it was entered into (like the Compact here) by way of *640 settlement of a continuing boundary dispute. “If any inference at all is to be drawn from [the compact’s] silence on the subject of regulatory authority,” we said, “it is that each State was left to regulate the activities of her own citizens.” Id., at 67. Virginia v. Maryland effectively decided this case.
V
Finally, I must remark at greater length upon the Court’s peculiar limitation upon New Jersey’s wharfing-out rights— that it excludes wharves of “extraordinary character.” But for that limitation, the Court’s conclusion is precisely the same as my own: “Given the authority over riparian rights that the 1905 Compact preserves for New Jersey, Delaware may not impede ordinary and usual exercises of the right of riparian owners to wharf out from New Jersey’s shore.” Ante, at 622. The Court inexplicably concludes, however, that the liquefied natural gas (LNG) unloading wharf at stake in this litigation “goes well beyond the ordinary or usual.” Ibid. Why? Because it possesses “extraordinary character.”
To our knowledge (and apparently to the Court’s, judging by its failure to cite any authority) the phrase has never been mentioned before in any case involving limitations on wharfing out. What in the world does it mean? Would a pink wharf or a zig-zagged wharf qualify? Today’s opinion itself gives the phrase no content other than to say that “Delaware’s classification of the proposed LNG unloading terminal as a ‘[hjeavy industry use’ and a ‘bulk product transfer facilit[y]’ . . . has not been, and hardly could be, challenged as inaccurate.” Ante, at 622-623. This rationale is bizarre. There is no reason why any designation by the Delaware Department of Natural Resources and Environmental Control would be relevant to, let alone controlling on, the meaning of the 1905 Compact; and no reason why New Jersey’s authority under the 1905 Compact should turn on the state-law question whether Delaware “rationally categorize[s]” a *641 wharf under its own statutes, ante, at 623, n. 21. Wharves were commonly used for “heavy industry use” when the 1905 Compact was adopted, and their primary commercial use was to transfer bulk cargoes. One roughly contemporaneous book on the design and building of wharves in America included information on appropriate pavement material to enable use of trucks on wharves, the proper method of laying down railroad tracks, and the construction of hatch cranes for unloading cargo. See C. Greene, Wharves and Piers: Their Design, Construction, and Equipment 191-194, 206-215 (1917). The Court gives no reason why the terminal’s character as a “[h]eavy industry use” and a “bulk product transfer facility] ” matters in the slightest. Indeed, the Court does not take its state-law reason for “extraordinary character” seriously, conceding that Delaware could not regulate an identical wharf for the “bulk product transfer” of “tofu and bean sprouts,” ante, at 623, n. 21.
Apart from the Delaware Department’s “[h]eavy industry use” and “bulk product transfer” designations, the Court cites, as support for its conclusion that this wharf is of “extraordinary character,” its own factual background section describing the wharf. See ante, at 622-623 (citing ante, at 606-607). It is not clear which, if any, of the facts discussed there the Court claims to be relevant, and I am forced to speculate on what they might be.
Could it be the size of the wharf, which is 2,000 feet long, see ante, at 606, and extends some 1,455 feet into Delaware territory, see Brief for BP America Inc. et al. as Amici Curiae 1-2? But the Court cites not a single source for this length limitation upon wharfing out. We did not intimate, in holding in Virginia v. Maryland that Virginia could authorize construction of a water intake pipe extending 725 feet from its shoreline into Maryland, see 540 U. S., at 63, that the result turned on the length of the pipe. As I have discussed, the common law did establish a size limitation for wharves: the wharf could not be extended so far as to interfere need *642 lessly with the public’s “right of navigation” in navigable waters. 1 Farnham § 111, at 521. Wharves constructed to access the water could “project to a distance from the shore necessary to reach water which shall float vessels, the largest as well as the smallest.” Id., at 522 (emphasis added). Delaware has not claimed that the wharf in this ease will interfere with navigation of the river, which is approximately one mile wide at this location, see Brief for BP America Inc. et al. as Amici Curiae 2. And the record reveals that New Jersey, at least, anticipated that wharves on its side of the river could extend as far as the wharf in this case by establishing pierhead lines in 1877 and 1916 that extended “below low water mark at distances varying from 378 to 3,550 feet.” 1 NJ App. 135a; see also 3 id., at 369a, 376a (affidavit of Richard G. Castagna). (Pierhead lines mark the permissible “outshore limit of structures of any kind.” Greene, supra, at 27.)
Could the fact rendering this a wharf of “extraordinary character” be that its construction would require the dredging of 1.24 million cubic yards of soil within Delaware’s territory? Ante, at 606-607. This is suggested, perhaps, by the portion of the decree which says that “Delaware acted within the scope of its governing authority to prohibit unreasonable uses of the . .. soil within the twelve-mile circle.” Ante, at 624; see also ante, at 607, n. 8. But no again. Although the record contains no evidence of the dredge volumes required to construct the wharves on the river at the time of the Compact’s adoption, it does show that an 1896 navigational improvement required the dredging of 35 million cubic yards from the Delaware River, and a 1907 dredging at Cape May Harbor, New Jersey, removed 19.7 million cubic yards. 7 NJ App. 1224a, 1234a (affidavit of J. Richard Weggel). At the very least, the dredging of 1.24 million cubic yards “would have been familiar to or ascertainable by individuals interested in riparian uses or structures at the time the Compact was signed or ratified.” Id., at 1227a. I do not *643 know what to make of the Court’s response that the instances of dredging that I have cited involved “public works.” Ante, at 607, n. 8. Is that a limitation upon the Court’s holding — only private wharves of “extraordinary character” can be regulated by Delaware? But in fact dredging seems to have nothing to do with the issue, since (once again) the Court acknowledges that the same wharf for tofu and bean sprouts would be OK.
Could the determinative fact be that the wharf would service “[sjupertankers with capacities of up to 200,000 cubic meters (more than 40 percent larger than any ship then carrying natural gas),” ante, at 606; that these ships “would pass densely populated areas” and require establishment of “a moving safety zone [that] would restrict other vessels 3,000 feet ahead and behind, and 1,500 feet on all sides,” ante, at 606, n. 7? This is suggested, perhaps, by the portion of the decree which says that “Delaware acted within the scope of its governing authority to prohibit unreasonable uses of the river . . . within the twelve-mile circle.” Ante, at 624. But surely not. Whatever power Delaware has to restrict traffic on the waters of the United States (a question not presented by this case, though one that seems not to inhibit the decree’s blithe positing of state “authority to prohibit unreasonable uses of the river,” ibid.), it has no bearing on whether New Jersey can build the wharf without Delaware’s interference.
Could the determinative fact be that the wharf will be used to transport liquefied natural gas, which is dangerous? No again. The Court cites no support, and I am aware of none, for the proposition that the common law forbade a wharf owner to load or unload hazardous goods. At the time of the Compact’s adoption, congressional sources reported that the Delaware River was used to transport, among other items, coal tar and pitch, sulfur, gunpowder, and explosives. Annual Report of the Chief of Engineers, United States Army, H. R. Doc. No. 22, 59th Cong., 2d Sess., 1031-1033 *644 (App. H) (1906) (tabulating commerce on the Delaware River by item in 1904 and 1905). Books published some time after the adoption of the Compact discuss the proper handling of seaborne “dangerous goods,” including liquids such as benzene, petroleum, and turpentine. See J. Aeby, Dangerous Goods (2d ed. 1922); R. MacElwee & T. Taylor, Wharf Management: Stevedoring and Storage 41, 221 (1921). There is not a shred of evidence that the parties to the Compact understood that New Jersey and Delaware would not be authorized to grant riparian rights for the loading and unloading of goods that are — under some amorphous and unexplained criteria — dangerous.
I say that none of these factors has any bearing upon whether, at law, the wharfing out at issue here is anything more than the usual and ordinary exercise of a riparian right. I am not so rash as to suggest, however, that these factors had nothing to do with the Court’s decision. After all, our environmentally sensitive Court concedes that if New Jersey had approved a wharf of equivalent dimensions, to accommodate tankers of equivalent size, carrying tofu and bean sprouts, Delaware could not have interfered. See ante, at 623, n. 21.
According to one study, construction activities on the LNG facility in this case would have created more than 1,300 new jobs, added $ 277 million to New Jersey’s gross state product, and produced $13 million in state and local tax revenues. J. Seneca et al., Economic Impacts of BP’s Proposed Crown Landing LNG Terminal 65 (Apr. 2007), online at http://www. policy.rutgers.edu/news/reports/other/BPCrownLanding.pdf (as visited Mar. 28, 2008, and available in Clerk of Court’s case file). Operation of the facility was projected to generate 231 permanent jobs, and more than $88 million in state and local tax revenues over a 30-year period. Ibid. Its delivery capacity would represent 15 percent of the current consumption of natural gas in the region. Id., at 66. In *645 holding that Delaware may veto the project, the Court owes New Jersey — not to mention an energy-starved Nation— something more than its casual and unsupported statements that the wharf possesses “extraordinary character” and “goes well beyond the ordinary or usual.”
Today’s decision does not even have the excuse of achieving a desirable result. If one were to design, ex ante, the socially optimal allocation of the power to permit and forbid wharfing out, surely that power would be lodged with the sovereign that stands most to gain from the benefits of a wharf, and most to lose from its environmental and other costs. Unquestionably, that is the sovereign with jurisdiction over the land from which the wharf is extended. Delaware and New Jersey doubtless realized this when they agreed in 1905 that each of them would have jurisdiction over riparian rights on its own side of the river. The genius of today’s decision is that it creates irrationality where sweet reason once prevailed — straining mightily, against all odds, to ensure that the power to permit or forbid “heavy industry use” wharves in New Jersey shall rest with Delaware, which has no interest whatever in facilitating the delivery of goods to New Jersey, which has relatively little to lose from the dangerous nature of those goods or the frequency and manner of their delivery, and which may well have an interest in forcing the inefficient location of employment- and tax-producing wharves on its own shore. It makes no sense.
Under its decree, “[t]he Court retains jurisdiction to entertain such further proceedings, enter such orders, and issue such writs as it may from time to time deem necessary or desirable to give proper force and effect to this Decree or to effectuate the rights of the parties.” Ante, at 624. This could mean, I suppose, that we can anticipate a whole category of original actions in this Court that will clarify, wharf by wharf, what is a wharf of “extraordinary character.” (Who would have thought that such utterly indefinable and unpredictable complexity lay hidden within the words of the *646 Compact?) More likely, however, prospective builders of “heavy industry use” wharves from the New Jersey shore— of whatever size — will apply to Delaware and simply go elsewhere if rejected.
The wharf at issue in this litigation would have been viewed as an ordinary and usual riparian use at the time the two States entered into the 1905 Compact. Delaware accordingly may not prohibit its construction. I respectfully dissent from the Court’s judgment to the contrary.

The post-Compact-conduet argument is not the only portion of the Court’s reasoning that is a mismatch with its conclusion. So is its reliance upon Article VIII of the Compact, ante, at 611-612, 622 — an argument so weak that it deserves only a footnote response. Article VIII provides that nothing in the Compact “shall affect the territorial limits, rights, or jurisdiction of either State .. . except as herein expressly set forth.” 34 Stat. 860 (emphasis added). But New Jersey’s riparian rights are expressly set forth, so the only question — the one I have addressed above— is what those rights consist of. But accepting the Court’s overreading of Article VIII (which presumably requires each of the riparian rights to be named one by one), it is utterly impossible to see why Article VII is any more “expres[s]” in setting forth New Jersey’s authority over wharves that lack “extraordinary character” than it is in setting forth her authority over wharves that possess it. Once again, the argument supports not the Court’s holding, but rather Delaware’s more expansive theory that it may regulate any and all wharves built from the Jersey shoreline. There is, to tell the truth, nothing whatever to support the Court’s holding.